**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| FELIX PAYMENT SYSTEMS LTD. | ) | Case No. 25-00053-5 |
| | ) | |
| Debtor. | ) | Chapter 15 |
| | ) | |
| _____ | ) | |

**EMERGENCY MOTION FOR ENTRY OF AN ORDER GRANTING PROVISIONAL
RELIEF UNDER SECTION 1519 OF THE BANKRUPTCY CODE**

NOW COMES Felix Payment Systems Ltd. as the foreign debtor and foreign representative (the "Foreign Debtor" or "Foreign Representative"), who is the subject of a reorganization proceeding (the "CCAA Proceeding") commenced under Canada's *Companies' Creditors Arrangement Act* (the "CCAA"), pending before the Supreme Court of British Columbia (the "Canadian Court") by its undersigned counsel, respectfully submits this motion (the "Motion") and requests the entry of an Order granting provisional relief pursuant to Sections 105(a) and 1519(a) of Title 11 of the United States Code (the "Bankruptcy Code") pending this Court's entry of an order recognizing the CCAA Proceeding as a "foreign main proceeding and granting such other relief as may be necessary and appropriate, and respectfully shows in support thereof:

**PRELIMINARY STATEMENT**

By the Motion, the Foreign Debtor as Foreign Representative seeks to preserve the *status quo* in order to ensure that the Foreign Debtor will have the opportunity to restructure its business for the benefit of all stakeholders as contemplated under the United States Bankruptcy Code and Canadian law.

Among other reasons explained herein and in the Declaration of Andrew Cole filed concurrently herewith, the Foreign Debtor commenced the CCAA Proceeding and filed the Chapter 15 Petition (the "Petition") based upon defaults asserted by the Robert Alpert Group, and their related efforts to enforce a default judgment it obtained in Ohio State Court. Upon the commencement of the CCAA Proceeding, the Canadian Court issued an Initial Order, followed by an Amended and Restated Initial Order, appointing Alvarez & Marsal Canada Inc. as the Monitor and authorizing the Foreign Debtor to act as the foreign representative in filing a chapter 15 petition.

The Foreign Debtor as Foreign Representative promptly filed the Petition and is seeking a hearing on recognition of the CCAA Proceeding as the "foreign main proceeding" at the Court's earliest convenience. However, due to notice requirements, there will be a period of days after the filing of the Petition before the hearing on recognition can take place. During this interim period, the automatic stay does not apply to protect the Foreign Debtor and its assets in the United States from attempts by the Robert Alpert Group to exercise remedies. These remedies may include, without limitation, efforts by the Robert Alpert Group to levy the Foreign Debtor's bank accounts in the United States, and to intercept accounts receivable owned by the Foreign Debtor by redirecting customers to pay the Robert Alpert Group instead of the Foreign Debtor. Therefore, absent the provisional relief sought in the Motion, the Foreign Debtor is exposed to the risk that the Robert Alpert Group (or other creditors) could attempt to exercise remedies against the Foreign Debtor and its assets in the United States in contravention of the Initial Order, as amended by the Amended and Restated Initial Order, which imposed a stay until February 28, 2025.

This risk (even before it can be realized) threatens to undermine the Foreign Debtor's restructuring efforts from the very outset. Due to the nature of the Foreign Debtor's operations

166182545.4

and the need to obtain certifications to continue operations, the Foreign Debtor's ability to fund these expenses are crucial.  Combined with the liquidity crisis that the Foreign Debtor is facing due to disputes with certain investors, the Foreign Debtor requires access to its cash, including the funds available in its Bank Accounts so it can continue operations, and successfully reorganize.  If the Robert Alpert Group (or other creditors) can enforce remedies against the Foreign Debtor in the United States, and levy upon its assets, this could trigger a chain reaction of disruptions, which would essentially ruin the Foreign Debtor's attempts at reorganization.

For these reasons and as explained in greater detail below, the Foreign Debtor has an urgent need for the provisional relief requested in the Motion.  As further set forth below, the Foreign Debtor has satisfied the requirements for issuance of such relief pursuant to Section 1519 of the Bankruptcy Code.  Therefore, the Foreign Debtor respectfully submits that the Court should grant the Motion and enter the order granting provisional relief pursuant to Section 1519 of the Bankruptcy Code.

## JURISDICTION AND VENUE

1.    The Court has jurisdiction to consider the Petition pursuant to 28 U.S.C. §§ 157 and 1334.

2.    The Foreign Debtor has properly commenced this case under sections 1504 and 1515 of the Bankruptcy Code by filing the Petition.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.    Venue for this chapter 15 case is proper under section 1410(1) of title 28 of the United States Code because the Foreign Debtor has principal assets in this district through the continuing ownership interest in bank accounts held at the Royal Bank of Canada branch located in Raleigh, North Carolina (the "Bank Accounts").

3

4.      The statutory bases for the relief requested in this Motion are sections 105(a), 1504, 1515, 1517, 1519, 1520 and 1521 of the Bankruptcy Code.

## FACTUAL BACKGROUND

5.      The Foreign Debtor is a privately-held financial technology company based in Vancouver, British Columbia specializing in cloud-based payment acceptance infrastructure and associated software systems.   The Foreign Debtor, as a start-up technology company, has developed a novel cloud-based payment acceptance infrastructure and associated software system that transforms non-traditional hardware into a certified payment terminal.  Declaration of Andrew Cole ("Cole Declaration") at ¶ 5.

6.      Companies operating payment processing technology are highly regulated.  As such, the Foreign Debtor requires a number of certifications to operate its product.  The Foreign Debtor is in the start-up phase and is still in the process of attaining these certifications, as discussed above. Those certifications are time and resource intensive and have been the largest financial burden on the Foreign Debtor since its incorporation.  Cole Declaration at ¶ 6.

7.      In addition to difficulties faced in obtaining certifications, the Foreign Debtor is experiencing a liquidity crisis because funding has stopped, and there are disputes between certain investors and the Foreign Debtor regarding the amount, nature and security of those debts.  Cole Declaration at ¶ 7.

8.      Based on the Foreign Debtor's books and records, as of September 30, 2024, the Foreign Debtor had total unconsolidated assets with a book value of approximately $653,291.05 and had total unconsolidated liabilities with a book value owing of approximately $19,005,102.01. Cole Declaration at ¶ 8.

166182545.4

9.      On October 15, 2024 (the "NOI Filing Date"), the Foreign Debtor filed a Notice of Intention to Make a Proposal (the "NOI") pursuant to Section 50.4(1) of the *Bankruptcy and Insolvency Act* (Canada), as amended (the "BIA"), which commenced the NOI proceeding (the "NOI Proceeding"), and Alvarez & Marsal Canada Inc. ("A&M" or "Monitor") was appointed as the Proposal Trustee of the Foreign Debtor.  Cole Declaration at ¶ 9.

10.     On November 25, 2024, the Foreign Debtor was granted an order (the "Initial Order") by the Canadian Court under the CCAA thus commencing the CCAA Proceeding. Accordingly, the Foreign Debtor's proceedings under the BIA were converted into a proceeding under the CCAA.  Cole Declaration at ¶ 10.  Attached hereto as **Exhibit "A"** is a true and correct copy of the Initial Order.

11.     Pursuant to the Initial Order, A&M was appointed as Monitor of the business and financial affairs of the Foreign Debtor in the CCAA Proceeding.  Cole Declaration at ¶ 10; Exhibit A at ¶ 49.

12.     The Initial Order provides for, among other things, a stay of proceedings initially expiring on December 6, 2024 (the "Stay Period").  Cole Declaration at ¶ 12; Exhibit A at ¶ 12.

13.     On December 6, 2024, the Canadian Court entered an Amended and Restated Initial Order extending the Stay Period to February 28, 2025.  Cole Declaration at ¶ 13.  Attached hereto as **Exhibit "B"** is a true and correct copy of the Amended and Restated Initial Order.

14.     The Amended and Restated Initial Order reiterated that A&M and the Foreign Debtor were authorized "to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the [Foreign Debtor] to apply to the United States Bankruptcy Court

for relief pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 101-1330, as amended."  Cole Declaration at ¶ 14; Exhibit B at ¶ 57.

15.     Prior to the commencement of the CCAA Proceeding, on November 27, 2023, Mr. Robert Alpert and his related entities (collectively, the "Robert Alpert Group") filed a complaint ("Complaint") against the Foreign Debtor in the Court of Common Pleas of Cuyahoga County, Ohio (the "Ohio State Court"); Case No.: CV 23 969133 (the "Ohio Lawsuit").  Cole Declaration at ¶ 15; **Exhibit "1"** thereto.

16.     On May 6, 2024, the Ohio State Court entered default judgment (the "Default Judgment") against the Foreign Debtor in favor of the Robert Alpert Group.  Cole Declaration at ¶ 16; **Exhibit "2"** thereto.

17.     Since entry of the Default Judgment, the Robert Alpert Group has been attempting to domesticate their judgment across the United States and to redirect payments from the Foreign Debtor's United States customers, and/or levy against the Foreign Debtor's assets.   Cole Declaration at ¶ 17.

18.     On November 22, 2024, counsel for the Robert Alpert Group served a judgment notice on the general counsel of the Los Angeles Clippers, indicating that the Robert Alpert Group intends on domesticating the judgment and collecting on the judgment, "including seeking satisfaction through collection of the tangible and intangible assets of [the Foreign Debtor], including but not limited to, any accounts receivable, which would include license, royalty fees, and venture revenue of [the Foreign Debtor]."  Cole Declaration at ¶ 18; **Exhibit "3"** thereto.

19.     By filing a chapter 15 petition in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Court"), the Foreign Debtor as Foreign Representative now seeks the assistance of this Court to, among other things, recognize the CCAA Proceeding as the foreign

main proceeding, to obtain the benefits of the automatic stay, and stop the Robert Albert Group from levying against the Foreign Debtor's assets, including their efforts to redirect accounts receivable owed to the Foreign Debtor by its U.S. customers, and certain bank accounts held at the Royal Bank of Canada branch located in Raleigh, North Carolina, which are critical to the Foreign Debtor's reorganization efforts.  Cole Declaration at ¶ 19.

20.     For further information regarding the Foreign Debtor's background, the CCAA Proceeding, and the facts and circumstances necessitating this chapter 15 case, the Court is respectfully referred to the Petition, the Declaration of Andrew Cole filed concurrently herewith, and the Affidavit of Andrew Cole submitted in the CCAA Proceeding (without accompanying exhibits for sake of brevity), attached hereto as **Exhibit "C,"** which are each incorporated by reference as if set forth fully in this Motion.

## BASIS FOR RELIEF

21.     For the reasons set forth below, the Foreign Debtor as Foreign Representative respectfully requests entry of an order granting provisional relief under section 1519(a) of the Bankruptcy Code.

**I.      The Foreign Debtor Urgently Needs Provisional Relief Under Section 1519(a) of the Bankruptcy Code To Protect Its Assets and the Interests of Creditors**

22.     Section 1519(a) of the Bankruptcy Code provides that "[f]rom the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature. . . ."  11 U.S.C. § 1519(a); *see also Jaffe v. Samsung Electronics Co., Ltd.*, 737 F.3d. 14, 24 (4th Cir. 2013) ("Even before entry of the order granting recognition, § 1519 authorizes the bankruptcy court, on the foreign representative's

request, to grant preliminary relief when 'urgently needed to protect the assets of the debtor or the interests of the creditors.'") (citing 11 U.S.C. § 1519).

23.     Here, the Default Judgment obtained and asserted by the Robert Alpert Group and the potential for the Robert Alpert Group to exercise remedies against the Foreign Debtor and its assets in the United States present precisely the type of "urgent need" that section 1519(a) was intended to address.  Continued uninterrupted receipt of payment by the Foreign Debtor's U.S. customers is critical to ensure that the Foreign Debtor has access to sufficient revenue to enable the Foreign Debtor to operate and pay the costs of administration of the CCAA proceeding. Similarly, the Bank Accounts contain funds that are critical to the Foreign Debtor's operations and ultimate reorganization.  Combined with the liquidity crisis that the Foreign Debtor is facing due to disputes with certain investors, including the Robert Alpert Group, the Foreign Debtor requires access to these funds in its U.S. Bank Accounts so it can continue operations, and successfully reorganize.  If the Robert Alpert Group were to enforce remedies against the Foreign Debtor in the United States, redirect U.S. customers from paying accounts receivable to the Foreign Debtor, and levy upon the Foreign Debtor's Bank Accounts, then this could trigger a chain reaction of disruptions, which would essentially ruin the Foreign Debtor's attempts at reorganization.  The mere threat of the Robert Alpert Group seizing the Foreign Debtor's accounts receivables and levying its Bank Accounts will cause severe cash flow disruptions for the Foreign Debtor, which have been exasperated by other circumstances.

24.     In the absence of the imposition of a stay during the gap period between the Petition Date and the date that the Court grants recognition, there is a significant risk of a cascade effect that would threaten the Foreign Debtor's viability, its value, and ability to reorganize.

166182545.4

II.     **The Foreign Debtor as Foreign Representative Has Satisfied the Injunctive Standards, Procedures and Limitations Made Applicable Under Section 1519(e) of the Bankruptcy Code.**

25.     Section 1519(e) provides that "[t]he standards, procedures, and limitations applicable to an injunction shall apply to relief under this section." 11 U.S.C. § 1519(e); *see also In re Qimonda AG*, No. 09-14766-RGM, 2009 WL 2210771, at *3 (Bankr. E.D. Va. July 16, 2009) ("Section 1519(e) provides that the 'standards, procedures, and limitations applicable to an injunction shall apply to relief" under § 1519.'"); *In re Worldwide Educ. Servs., Inc.*, 494 B.R. 494, 499 (Bankr. C.D. Cal. 2013) ("the standard of proof for preliminary injunctive relief should apply" to a request for provisional relief under section 1519); *In re Innua Canada Ltd.*, No, 09-16362 (DHS), 2009 WL 1025088, at *3 (Bankr. D.N.J. Mar. 25, 2009) ("provisional relief under § 1519 of the Bankruptcy Code requires satisfaction of the injunctive relief standard by the foreign representative.").

26.     For a Court to grant a preliminary injunction, the movant must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 20 (2008); *see, e.g., Worldwide Educ. Servs.*, 494 B.R. at 499 (applying *Winter* test in context of request for provisional preliminary injunctive relief under section 1519); *Qimonda*, 2009 WL 2210771, at *3 (same); *WV Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009) (same) .[1]

---

[1] Bankruptcy Rule 7065 expressly provides that "a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." Fed. R. Bankr. P. 7065. Section 1521(a)(7) of the Bankruptcy Code provides that upon recognition of a foreign proceeding (whether main or non-main), the Court may grant additional relief that may be available to a trustee (subject to certain exceptions

27.    Here, the Foreign Debtor satisfies each of the requisite elements to obtain a preliminary injunction.

28.    *First*, the Foreign Debtor has a reasonable likelihood of success in obtaining recognition of the CCAA Proceeding as the foreign main proceeding.  As set forth in the Petition and the *Motion of the Foreign Debtor as Foreign Representative for Chapter 15 Recognition and Final Relief* (filed simultaneously herein), the Foreign Debtor has adequately demonstrated that the CCAA Proceeding is a "foreign proceeding," as defined in Section 101(23) of the Bankruptcy Code and that the Foreign Debtor as Foreign Representative is a "foreign representative" as defined in Section 101(24) of the Bankruptcy Code.  Indeed, the Canadian Court specifically authorized the Foreign Debtor to act as foreign representative to file the chapter 15 petition and seek relief in connection therewith.  *See* Cole Declaration at ¶¶ 11, 14; Exhibit B at ¶ 57.  In addition, the Foreign Debtor has satisfied its burden that the CCAA Proceeding is a "foreign main proceeding" as defined in Section 1502(4) of the Bankruptcy Code.  Therefore, the Foreign Debtor has demonstrated more than a reasonable likelihood of success that the CCAA Proceeding will be recognized pursuant to Section 1517 of the Bankruptcy Code.

29.    Moreover, the Foreign Debtor as Foreign Representative also has more than a reasonable likelihood of success with respect to the specific relief requested in this Motion.  As set forth above, the Foreign Debtor urgently needs provisional relief under section 1519 to protect its assets and/or the interests of creditors.  In particular, the Foreign Debtor urgently needs to ensure that the Robert Alpert Group does not seize its assets or interrupt the Foreign Debtor's access to its funds from customers or deposited in the Bank Accounts.  If the Initial Order and Amended

---

not applicable here).  Section 1519(a)(3) expressly makes relief under Section 1521(a)(7) available on a provisional basis.  Therefore, to the extent Rule 65 of the Federal Rules of Civil Procedure applies, the Court has the authority to waive the security requirements imposed by Rule 65(c), and the Foreign Representative respectfully request a waiver of such requirements.

and Restated Initial Order entered by the Canadian Court is not enforced outside of Canada and the Robert Alpert Group is permitted to enforce remedies against the Foreign Debtor in the United States, then the Foreign Debtor's prospects for reorganization will be severely jeopardized.

30.    Courts across the country have routinely enforced Canadian orders and granted motions seeking provisions relief in chapter 15 cases. *See, e.g., Ideal Protein of America Inc.*, No. 23-18159 [Doc. No. 6] (Bankr. S.D. Fla. Oct. 5, 2023) (granting motion for provisional relief, which barred contract counterparties from enforcing ipso facto clauses and recognized a Canadian order approving a sale and investment solicitation process and a key employee retention plan); *BRON Media Holdings USA Corp.*, No 23-56798 [Doc. No. 15] (Bankr. N.D. Ga. July 19, 2023) (granting motion for provisional relief and enforcing the initial order entered by the Canadian court); *Flo-Back Equipment Inc.*, No. 24-90059 [Doc. No. 15] (Bankr. S.D. Tex. Feb. 20, 2024) (granting order for provisional relief pursuant to Bankruptcy Code 1519 pending entry of an order recognizing the Canadian proceeding); *BioSteel Sports Nutrition Inc.*, No. 23-90777 (Bankr. S.D. Tex. Sept. 17, 2023) (same); *Dynamic Technologies Group Inc.*, No. 23-41416 [Doc No. 59] (Bankr. N.D. Tex. May 17, 2023) (granted motion to enforce the CCAA vesting orders and approved the sale of the debtors' assets); *In re Ephedra Products Liabt. Litig.*, 349 B.R. 333, 337 (S.D.N.Y. 2006) (granting full force and effect to order in Canadian proceeding approving claims resolution procedure that denied product liability claimants the right to a jury trial); *In re Sino-Forest Corp.*, 501 B.R. 655, 666 (Bankr. S.D.N.Y. 2013) (granting full force and effect to order in Canadian proceeding implementing plan of reorganization that included non-debtor releases that might be not have been approved by U.S. bankruptcy court as part of a chapter 11 plan); *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 700 (Bankr. S.D.N.Y. 2010) (same) ("Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the

United States whether or not the same relief could be ordered in a plenary case under chapter 11."); *In re Grant Forest Products, Inc.*, 440 B.R. 616, 622 (Bankr. D. Del. 2010) (granting full force and effect to order in Canadian proceeding authorizing administrator to sign tax returns for Canadian debtor's U.S. subsidiaries without incurring tax liability to the IRS); *In re Chemokine Therapeutics Corp.*, Case No. 09-11189 (PJW) (Bankr. D. Del. April 28, 2009) [Docket No. 15] (recognizing and giving full force and effect to two Canadian orders approving the sale of certain assets); *In re Abitibi-Consolidated, Inc.*, Case No. 09-11348 (KJC) (Bankr. D. Del. April 21, 2009) [Docket No. 18] (giving full force and effect to Canadian court order approving debtors' securitization plan); *In re Destinator Technologies, Inc.*, Case No. 0811003 (CSS) (Bankr. D. Del. July 8, 2008) [Docket No. 63] (granting enforcement of Canadian order approving sale of two of debtors' subsidiaries); *In re Hollinger, Inc.*, Case No. 07-11029 (PJW) (Bankr. D. Del. May 30, 2008) [Docket No. 89] (granting full force and effect to Canadian order and authorizing foreign representative to take any steps necessary to implement terms of order).

31.     Indeed, sections 1525 and 1527 of the Bankruptcy Code, when read in conjunction, direct this Court to cooperate "to the maximum extent possible" with the Canadian Court regarding "the coordination of the administration and supervision" of the Foreign Debtor's assets and affairs. 11 U.S.C. §§ 1525 and 1527(3).  Section 1507 of the Bankruptcy Code further provides that "[s]ubject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative."  11 U.S.C. § 1507(a). Congress specifically directed that the Court should make a determination whether to provide such additional assistance "consistent with the principles of comity."  11 U.S.C. § 1507(b).

32.     Once the CCAA Proceeding is recognized as a foreign main proceeding, section 1520 of the Bankruptcy Code will impose the automatic stay under section 362 of the Bankruptcy

Code with respect to the Foreign Debtor and all property of the Foreign Debtor that is within the territorial jurisdiction of the United States.  11 U.S.C. § 1520(a)(1).  In addition, as long as the CCAA Proceeding is recognized as a foreign proceeding (whether main or non-main), Section 1521(a) of the Bankruptcy Code permits this Court to, "where necessary to effectuate the purpose of [chapter 15] . . . at the request of the foreign representative, grant any appropriate relief, including. . . staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a)."  11 U.S.C. § 1521(a)(1).  Similarly, section 1521(a)(2) provides for the stay of the "execution against the debtor's assets."  11 U.S.C. § 1521(a)(2).  Section 1521(b) further provides authorization upon recognition of a foreign proceeding for the Court to "entrust the distribution of all or part of the debtor's assets in the U.S. to the foreign representative."  11 U.S.C. § 1521(b).

33.     *Second*, the Foreign Debtor would face irreparable harm absent immediate provisional relief.  Case law under former Section 304 of the Bankruptcy Code continues to inform bankruptcy court decisions under its statutory successor, Chapter 15.  *See Iida v. Kitahara (In re Iida)*, 377 B.R. 243, 256 (B.A.P. 9th Cir. 2007).  In foreign proceedings under former Section 304, courts routinely recognized that dissipation of the finite resources of a debtor's estate constitutes irreparable injury, justifying court intervention on behalf of the debtor.  *See In re Netia Holdings S.A.*, 278 B.R. 344, 352 (Bankr. S.D.N.Y. 2002) ("It is well established . . . that the dissipation of the finite resources of an insolvent estate constitutes irreparable injury.").  In addition, the premature attachment or realization against property involved in a foreign proceeding also constitutes irreparable injury.  *See, e.g., In re MMG, LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("As a rule, . . . irreparable harm exists whenever local creditors of the foreign debtor seek

to collect their claims or obtain preferred positions to the detriment of the other creditors"); *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) (there is "little dispute regarding the notion that the premature piecing out of property involving a foreign . . . proceeding constitutes irreparable injury"). Indeed, the very purpose of the automatic stay is to protect the debtor "from the pressure and harassment of creditors seeking to collect their claims . . . [and to] provide breathing space to permit the debtor to focus on its rehabilitation or reorganization." 3 Collier on Bankruptcy ¶362.03 (16th ed. 2018); *see also* H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977) (noting that the automatic stay "gives the debtor a breathing spell from his creditors"). Not surprisingly, courts recognize that irreparable harm exists when a foreign estate's assets are threatened. *See A.P. Esteve Sales, Inc. v. Manning (In re Manning)*, 236 B.R. 14, 24 (B.A.P. 9th Cir. 1999) (Section 304 is "aimed at administering assets located in the United States, *preventing piecemeal distribution of assets of the foreign debtor as a result of legal proceedings initiated in domestic courts by local creditors,* and/or obtaining other appropriate relief." (quoting 2 Collier on Bankruptcy ¶ 304.03[1] (15th ed. 1998) (emphasis added by B.A.P.))); *In re Gercke*, 122 B.R. 621, 626 (Bankr. D.D.C. 1991) (same).

34. As set forth above, even the threat that the Robert Alpert Group could attempt to exercise remedies against the Foreign Debtor and its assets in the United States could have a catastrophic cascade effect, frustrate the purpose of the CCAA Proceeding, and prejudice the ability of the Foreign Debtor, its creditors and other stakeholders to obtain meaningful recoveries in the reorganization. The fact that the Foreign Debtor is in only the very initial stages of their restructuring efforts in the CCAA Proceeding makes this risk even more acute— the Foreign Debtor has not yet had the opportunity to develop and propose a plan of arrangement, and without

166182545.4

provisional relief they will be forever denied that opportunity.  Therefore, the Foreign Debtor faces irreparable harm if the provisional relief requested herein is denied.

35.     *Third,* the balance of hardships tips decidedly in favor of provisional relief.  Here, the harm to the Foreign Debtor if the if the provisional relief is denied significantly outweighs the minimal harm (if any) to the Robert Alpert Group if such relief is granted.  As set forth above, the Foreign Debtor and its estate will suffer irreparable harm if the Robert Alpert Group is permitted to enforce remedies against the Foreign Debtor and its assets in the United States.   Unless provisional relief is granted, the Foreign Debtor's restructuring efforts could be destroyed before they even have a chance to begin.

36.     By granting provisional relief, the Court would preserve the *status quo* pending a determination on the Foreign Debtor's request for recognition of the CCAA Proceeding.  Thus, the only effect on the Robert Alpert Group would be a short delay during the term of the provisional relief.  This minimal inconvenience to the Robert Alpert Group (and any other creditors) that would result from the provisional relief requested herein is heavily outweighed by the irreparable harm that the Foreign Debtor and other stakeholders would suffer if provisional relief were denied.

37.     *Fourth*, granting provisional relief to the Foreign Debtor is in the public interest. In enacting Chapter 15, Congress intended for United States courts to recognize and give effect to restructuring proceedings in foreign jurisdictions to promote cooperation, to protect the interests of all creditors and the debtor, to protect and maximize the value of the debtor's assets and to facilitate the resecure of financially troubled businesses.  *See* 11 U.S.C. § 1501; *see also Manning*, 236 B.R. at 26 ("Deferring to a foreign bankruptcy case is appropriate when the foreign law is not repugnant to American laws and policies." (internal quotation marks omitted)). Moreover, the "firm policy of American courts is the staying of actions against a corporation which is the subject

166182545.4

of a bankruptcy proceeding in another jurisdiction." *Cornfeld v. Investors Overseas Servs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979), *aff'd*, 614 F.2d 1286 (2d Cir. 1979).

38.　　Here, the CCAA Proceeding is in its nascent stage, with the stay being recently extended to February 28, 2025.  The Foreign Debtor has just begun its restructuring efforts and needs time to finish developing and obtaining approval for a plan of arrangement.  The Canadian Court authorized the Foreign Debtor to act as a foreign representative to file the chapter 15 Petition and seek the relief requested herein.  In order to preserve the Foreign Debtor's assets, the Foreign Debtor needs the provisional implementation of a stay to preserve the status quo until this Court is able to rule on the Foreign Debtor's motion for Chapter 15 recognition to prevent the Robert Alpert Group (and other creditors) from exercising remedies to the detriment of all other parties in interest.  Accordingly, the public interest weighs in favor of the Court granting provisional relief under Section 1519(e) of the Bankruptcy Code.

**WHEREFORE**, the Foreign Debtor as Foreign Representative respectfully requests that this Court enter an Order substantially in the form of the attached **Exhibit D** granting the provisional relief pursuant to Section 1519 of the Bankruptcy Code; and for further relief as the Court deems just or proper.

This the 7th day of January, 2025.

　　　　　　　　　　　　　　　　　　/s/ **Brian R. Anderson**
　　　　　　　　　　　　　　　　　　Brian R. Anderson
　　　　　　　　　　　　　　　　　　N.C. State Bar No. 37989
　　　　　　　　　　　　　　　　　　Fox Rothschild LLP
　　　　　　　　　　　　　　　　　　230 N. Elm Street, Suite 1200
　　　　　　　　　　　　　　　　　　Greensboro, NC 27401
　　　　　　　　　　　　　　　　　　Telephone: 336.378.5205
　　　　　　　　　　　　　　　　　　BRAnderson@FoxRothschild.com

　　　　　　　　　　　　　　　　　　*and*

166182545.4

Keith C. Owens
10250 Constellation Boulevard
Suite 900
Los Angeles, CA 90067
Telephone: 424.285.7056
KOwens@FoxRothschild.com

*Counsel for the Foreign Debtor and Foreign Representative*

17



**SUPREME COURT OF BRITISH COLUMBIA VANCOUVER REGISTRY**
NOV 2 5 2024
ENTERED

# EXHIBIT A

NO. S-248103
VANCOUVER REGISTRY

**SUPREME COURT OF BRITISH COLUMBIA**
**S E A L**
**VANCOUVER REGISTRY**

## IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36

AND

IN THE MATTER OF THE *BUSINESS CORPORATIONS ACT*, S.B.C. 2002, c. 57

AND

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
FELIX PAYMENT SYSTEMS LTD.

PETITIONER

### ORDER MADE AFTER APPLICATION
### (INITIAL ORDER)

| | | |
|---|---|---|
| BEFORE THE HONOURABLE | ) | MONDAY, THE 25TH DAY |
| | ) | |
| JUSTICE MASUHARA | ) | OF NOVEMBER, 2024 |

ON THE APPLICATION of the Petitioner, Felix Payment Systems Ltd., coming on for hearing at Vancouver, British Columbia on the 25th day of November, 2024; AND ON HEARING H. Lance Williams and Ashley Bowron, counsel for the Petitioner, and those other counsel listed on **Schedule "A"** hereto; AND UPON READING the material filed, including Affidavit #1 of Andrew Cole, sworn November 21, 2024 (the "**First Cole Affidavit**"), and the consent of Alvarez & Marsal Canada Inc. ("**A&M**") to act as the Monitor; AND UPON BEING ADVISED that the secured creditors who are likely to be affected by the charges created herein were given notice; AND pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36 as amended (the "**CCAA**"), the British Columbia Supreme Court Civil Rules and the inherent jurisdiction of this Court;



CHECKED
Mu

- 2 -

THIS COURT ORDERS AND DECLARES THAT:

**SERVICE**

1.      The time for service of the Petition dated November 21, 2024 is abridged such that it is property returnable today and service of the Petition and the First Cole Affidavit is hereby deemed good and sufficient.

**JURISDICTION**

2.      The Petitioner is a company to which the CCAA applies.

**CONTINUANCE UNDER THE CCAA**

3.      The proposal proceedings commenced by the Petitioner under Part III of the *Bankruptcy and Insolvency Act*, R.S.C. 1985 c. B-3, as amended (the "**BIA**") by filing a notice of intention to make a proposal (the "**NOI Proceeding**") on October 15, 2024 (the "**NOI Filing Date**") under Estate No. 11-3140093 and Court File No. VLC-S-B-240514 are hereby taken up and continued under the CCAA. The NOI Proceeding shall have no further force or effect, and is hereby terminated save that any and all acts, steps, agreements, and procedures validly taken, done, or entered into by the Petitioner during the NOI Proceeding shall remain valid, binding, and actionable within this proceeding (the "**CCAA Proceeding**"). For certainty, the approval of the Monitor's and its counsel's fees and disbursements, and approval of the Monitor's activities in the CCAA Proceeding shall be deemed approval of the fees, disbursements and activities of A&M in its capacity as the trustee of the proposal of the Petition (in such capacity, the "**Proposal Trustee**") and the fees and disbursements of the Proposal Trustee's counsel in the NOI Proceeding. The Petitioner is hereby authorized and directed to file a copy of this Order in the NOI Proceeding.

**SUBSEQUENT HEARING DATE**

4.      The hearing of the Petitioner's application for an extension of the Stay Period (as defined in paragraph 12 of this Order) and for any ancillary relief shall be held at the Courthouse at 800 Smithe Street, Vancouver, British Columbia at __10__ a.m./p.m. on __Friday__, the __6th__ day of __December__, 2024 or such other date as this Court may order.

- 3 -

**PLAN OF ARRANGEMENT**

5.      The Petitioner shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "**Plan**").

**POSSESSION OF PROPERTY AND OPERATIONS**

6.      Subject to this Order and any further Order of this Court, the Petitioner shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"), and continue to carry on its business (the "**Business**") in the ordinary course and in a manner consistent with the preservation of the Business and the Property. The Petitioner shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively, "**Assistants**") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for carrying out the terms of this Order.

7.      The Petitioner shall be entitled, but not required, to pay the following expenses which may have been incurred prior to the NOI Filing Date:

      (a)      all outstanding wages, salaries, employee and pension benefits (including long and short term disability payments), vacation pay and expenses (but excluding severance pay) payable before or after the NOI Filing Date, in each case incurred in the ordinary course of business and consistent with the relevant compensation policies and arrangements existing at the time incurred (collectively "**Wages**");

      (b)      the fees and disbursements of any Assistants retained or employed by the Petitioner which are related to the Petitioner's restructuring, at their standard rates and charges, including payment of the fees and disbursements of legal counsel retained by the Petitioner, whenever and wherever incurred, in respect of:

           (i)     the NOI Proceeding;

- 4 -

      (ii)     the CCAA Proceeding or any other similar proceedings in other jurisdictions in which the Petitioner or any subsidiaries or affiliated companies of the Petitioner are domiciled;

      (iii)    any litigation in which the Petitioner is named as a party or is otherwise involved, whether commenced before or after the NOI Filing Date;

      (iv)    any related corporate matters; and

  (c)    such suppliers of good and services as are deemed critical for the preservation of the Property and/or Business with the consent of the Monitor.

8.     Except as otherwise provided herein, the Petitioner shall be entitled to pay all expenses reasonably incurred by the Petitioner in carrying on the Business in the ordinary course following the NOI Filing Date, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

  (a)    all expenses and capital expenditures reasonably incurred and which are necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services, provided that any capital expenditure exceeding $50,000 shall be approved by the Monitor;

  (b)    all obligations incurred by the Petitioner after the NOI Filing Date, including without limitation, with respect to goods and services actually supplied to the Petitioner following the NOI Filing Date (including those under purchase orders outstanding at the NOI Filing Date but excluding any interest on the Petitioner's obligations incurred prior to the NOI Filing Date); and

  (c)    fees and disbursements of the kind referred to in paragraph 7(b) which may be incurred after the NOI Filing Date.

9.     The Petitioner is authorized to remit, in accordance with legal requirements, or pay:

  (a)    any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from Wages, including, without limitation, amounts in respect of (i)

- 5 -

employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes or any such claims which are to be paid pursuant to Section 6(3) of the CCAA;

(b)    all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Petitioner in connection with the sale of goods and services by the Petitioner, but only where such Sales Taxes accrue or are collected after the NOI Filing Date, or where such Sales Taxes accrued or were collected prior to the NOI Filing Date but not required to be remitted until on or after the NOI Filing Date; and

(c)    any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal property taxes, municipal business taxes or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors.

10.    Except as specifically permitted herein, the Petitioner is hereby directed, until further Order of this Court:

(a)    to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Petitioner to any of its creditors as of the NOI Filing Date except as authorized by this Order;

(b)    to make no payments in respect of any financing leases which create security interests;

(c)    to grant no security interests, trust, mortgages, liens, charges or encumbrances upon or in respect of any of its Property, nor become a guarantor or surety, nor otherwise become liable in any manner with respect to any other person or entity except as authorized by this Order;

(d)    to not grant credit except in the ordinary course of the Business only to its customers for goods and services actually supplied to those customers, provided such customers agree that there is no right of set-off in respect of amounts owing for such goods and services against any debt owing by the Petitioner to such customers as of the NOI Filing Date; and

- 6 -

(e)     to not incur liabilities except in the ordinary course of Business.

**RESTRUCTURING**

11.     Subject to such requirements as are imposed by the CCAA and such covenants as may be contained in the Definitive Documents (as hereinafter defined), the Petitioner shall have the right to terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate to permit the Petitioner to proceed with an orderly restructuring of the Business (the "**Restructuring**").

**STAY OF PROCEEDINGS, RIGHTS AND REMEDIES**

12.     Until and including December 6, 2024, or such later date as this Court may order (the "**Stay Period**"), no action, suit or proceeding in any court or tribunal (each, a "**Proceeding**") against or in respect of the Petitioner or the Monitor, or affecting the Business or the Property, shall be commenced or continued except with the written consent of the Petitioner and the Monitor or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Petitioner or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

13.     During the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Petitioner or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Petitioner and the Monitor or leave of this Court.

14.     Nothing in this Order, including paragraphs 12 and 13, shall: (i) empower the Petitioner to carry on any business which the Petitioner is not lawfully entitled to carry on; (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA; (iii) prevent the filing of any registration to preserve or perfect a mortgage, charge or security interest (subject to the provisions of Section 39 of the CCAA relating to the priority of statutory Crown securities); or (iv) prevent the registration or filing of a lien or claim for lien or the commencement of a Proceeding to protect lien or other rights that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such lien, claim for lien or Proceeding except for service of the initiating documentation on the Petitioner.

- 7 -

**NO INTERFERENCE WITH RIGHTS**

15.    During the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Petitioner, except with the written consent of the Petitioner and the Monitor or leave of this Court.

**CONTINUATION OF SERVICES**

16.    During the Stay Period, all Persons having oral or written agreements with the Petitioner or mandates under an enactment for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Petitioner, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with, or terminating the supply of such goods or services as may be required by the Petitioner, and that the Petitioner shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the NOI Filing Date are paid by the Petitioner in accordance with normal payment practices of the Petitioner or such other practices as may be agreed upon by the supplier or service provider and the Petitioner and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

17.    Notwithstanding any provision in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the NOI Filing Date, nor shall any Person be under any obligation to advance or re-advance any monies or otherwise extend any credit to the Petitioner on or after the NOI Filing Date. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

18.    During the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against the directors or officers of the Petitioner with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Petitioner whereby the directors or officers are alleged

- 8 -

under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Petitioner, if one is filed, is sanctioned by this Court or is refused by the creditors of the Petitioner or this Court. Nothing in this Order, including in this paragraph, shall prevent the commencement of a Proceeding to preserve any claim against a director or officer of the Petitioner that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such Proceeding except for service of the initiating documentation on the applicable director or officer.

## DIRECTORS AND OFFICERS INDEMNIFICATION AND CHARGE

19.     The Petitioner shall indemnify its directors and officers against obligations and liabilities that they may incur as directors or officers of the Petitioner after the commencement of the within proceedings , except to the extent that, with respect to any director or officer, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

20.     The directors and officers of the Petitioner shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of $150,000, as security for the indemnity provided in paragraph 19 of this Order. The Directors' Charge shall have the priority set out in paragraphs 36 and 38 herein.

21.     Notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) the Petitioner's directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 19 of this Order.

## APPOINTMENT OF MONITOR

22.     Alvarez & Marsal Canada Inc. ("**A&M**")  is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Petitioner with the powers and obligations set out in the CCAA or set forth herein, and that the Petitioner and its shareholders, officers, directors, and Assistants shall advise the Monitor of all material

- 9 -

steps taken by the Petitioner pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

23.     The Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

    (a)     monitor the Petitioner's receipts and disbursements;

    (b)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

    (c)     assist the Petitioner, to the extent required by the Petitioner, in its dissemination, to the DIP Lender (as hereinafter defined)  and its counsel on a bi-weekly basis of financial and other information as agreed to between the Petitioner and the DIP Lender which may be used in these proceedings including reporting on a basis to be agreed with the DIP Lender;

    (d)     advise the Petitioner in its preparation of the Petitioner's cash flow statements and reporting required by the DIP Lender, which information shall be reviewed with the Monitor and delivered to the DIP Lender and its counsel on a periodic basis, but not less than bi-weekly, or as otherwise agreed to by the DIP Lender;

    (e)     advise the Petitioner in its development of the Plan and any amendments to the Plan;

    (f)     assist the Petitioner, to the extent required by the Petitioner, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan;

    (g)     have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Petitioner, to the extent that is necessary to adequately assess the Petitioner's business and financial affairs or to perform its duties arising under this Order;

- 10 -

(h)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(i)     perform such other duties as are required by this Order or by this Court from time to time.

24.     The Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, or by inadvertence in relation to the due exercise of powers or performance of duties under this Order, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof, and nothing in this Order shall be construed as resulting in the Monitor being an employer or a successor employer, within the meaning of any statute, regulation or rule of law or equity, for any purpose whatsoever.

25.     The Monitor shall provide any creditor of the Petitioner and the DIP Lender with information provided by the Petitioner in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Petitioner is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Petitioner may agree.

26.     In addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, its appointment as the Proposal Trustee, or the carrying out of its role as the Proposal Trustee, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the rights and protections afforded the Monitor or the Proposal Trustee by the CCAA, the BIA, or any applicable legislation.

**ADMINISTRATION CHARGE**

27.     The Monitor, counsel to the Monitor, if any, and counsel to the Petitioner shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the Petitioner as part of the cost of these proceedings. The Petitioner is hereby authorized and

- 11 -

directed to pay the accounts of the Monitor, counsel to the Monitor and counsel to the Petitioner on a periodic basis. The prior payment by the Petitioner of retainers to the Monitor and counsel to the Petitioners in the amounts of $75,000 and $75,000, respectively are hereby authorized and the Petitioner is hereby authorized to pay to counsel to the Monitor a retainer in the amount of $50,000, such retainers to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

28.      The Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the British Columbia Supreme Court who may determine the manner in which such accounts are to be passed, including by hearing the matter on a summary basis or referring the matter to a Registrar of this Court.

29.      The Monitor, counsel to the Monitor, if any, and counsel to the Petitioner shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of $150,000, as security for their respective fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order which are related to the Petitioner's restructuring. The Administration Charge shall have the priority set out in paragraphs 36 and 38 hereof.

**INTERIM FINANCING**

30.      The Petitioner is hereby authorized and empowered to obtain and borrow under a credit facility from Mr. Jake Boxer, the CA Mordy Legacy Trust, and PEL Chartered Professional Accountants Inc. (collectively, the "**DIP Lender**") in order to finance the continuation of the Business and preservation of the Property, provided that borrowings under such credit facility shall not exceed $400,000 unless permitted by further Order of this Court.

31.      Such credit facility shall be on the terms and subject to the conditions set forth in the commitment letter between the Petitioner and the DIP Lender dated as of November 21, 2024 (the "**Commitment Letter**"), filed.

32.      The Petitioner is hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, the "**Definitive Documents**"), as are contemplated by the

- 12 -

Commitment Letter or as may be reasonably required by the DIP Lender pursuant to the terms thereof, and the Petitioner is hereby authorized and directed to pay and perform all of its indebtedness, interest, fees, liabilities and obligations to the DIP Lender under and pursuant to the Commitment Letter and the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

33.     The DIP Lender shall be entitled to the benefit of and is hereby granted a charge (the "**DIP Lender's Charge**") on the Property. The DIP Lender's Charge shall not secure an obligation that exists before this Order is made. The DIP Lender's Charge shall have the priority set out in paragraphs 36 and 38 hereof.

34.     Notwithstanding any other provision of this Order:

    (a)     the DIP Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lender's Charge or any of the Definitive Documents;

    (b)     upon the occurrence of an event of default under any of the Definitive Documents or the DIP Lender's Charge, the DIP Lender, upon five (5) business days notice to the Petitioner and the Monitor, may exercise any and all of its rights and remedies against the Petitioner or the Property under or pursuant to the Commitment Letter, Definitive Documents and the DIP Lender's Charge, including without limitation, to cease making advances to the Petitioner and set off and/or consolidate any amounts owing by the DIP Lender to the Petitioner against the obligations of the Petitioner to the DIP Lender under the Commitment Letter, the Definitive Documents or the DIP Lender's Charge, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Petitioner and for the appointment of a trustee in bankruptcy of the Petitioner; and

    (c)     the foregoing rights and remedies of the DIP Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Petitioner or the Property.

- 13 -

35.     The DIP Lender, in such capacity, shall be treated as unaffected in any plan of arrangement or compromise filed by the Petitioner under the CCAA, or any proposal filed by the Petitioner under the BIA, with respect to any advances made under the Definitive Documents.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

36.     The priorities of the Administration Charge, the Directors' Charge and the DIP Lender's Charge (collectively, the "**Charges**"), as among them, shall be as follows:

   First – Administration Charge (to the maximum amount of $150,000);

   Second –  DIP Lender's Charge;

   Third -  Directors' Charge (to the maximum amount of $150,000).

37.     Any security documentation evidencing, or the filing, registration or perfection of, the Charges shall not be required, and that the Charges shall be effective as against the Property and shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered or perfected subsequent to the Charges coming into existence, notwithstanding any failure to file, register or perfect any such Charges.

38.     Each of the Charges shall constitute a mortgage, security interest, assignment by way of security and charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, mortgages, charges and encumbrances and claims of secured creditors, statutory or otherwise, but excluding the security interest of Royal Bank of Canada in relation certain amounts held on deposit with them and registered in the Personal Property Registry of British Columbia as Base Registration No. 355037N (collectively, "**Encumbrances**"), in favour of any Person, save and except those claims contemplated by section 11.8(8) of the CCAA.

39.     Except as otherwise expressly provided herein, or as may be approved by this Court, the Petitioner shall not grant or suffer to exist any Encumbrances over any Property that rank in priority to, or *pari passu* with the Charges, unless the Petitioner obtains the prior written consent of the Monitor, the DIP Lender and the beneficiaries of the Administration Charge and the Director's Charge.

40.     The Administration Charge, the Director's Charge, the Commitment Letter, the Definitive Documents and the DIP Lender's Charge shall not be rendered invalid or unenforceable and the

- 14 -

rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Lender shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, mortgage, security agreement, debenture, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Petitioner; and notwithstanding any provision to the contrary in any Agreement:

    (a)    neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Commitment Letter or the Definitive Documents shall create or be deemed to constitute a breach by the Petitioner of any Agreement to which it is a party;

    (b)    none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Petitioner entering into the Commitment Letter, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

    (c)    the payments made by the Petitioner pursuant to this Order, the Commitment Letter or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

41.    Any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Petitioner's interest in such real property leases.

**SERVICE AND NOTICE**

42.    The Monitor shall (i) without delay, publish in the Globe & Mail a notice containing the information prescribed under the CCAA, (ii) within five days after Order Date, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed

- 15 -

manner, a notice to every known creditor who has a claim against the Petitioner of more than $1000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

43.     The Petitioner and the Monitor are at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Petitioner's creditors or other interested parties at their respective addresses as last shown on the records of the Petitioner and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

44.     Any Person that wishes to be served with any application and other materials in these proceedings must deliver to the Monitor by way of ordinary mail, courier, personal delivery or electronic transmission a request to be added to a service list (the "**Service List**") to be maintained by the Monitor. The Monitor shall post and maintain an up to date form of the Service List on its website at: www.alvarezandmarsal.com/felixpayment.

45.     Any party to these proceedings may serve any court materials in these proceedings by emailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, and the Monitor shall post a copy of all prescribed materials on its website at: www.alvarezandmarsal.com/felixpayment.

46.     Notwithstanding paragraphs 43 and 45 of this Order, service of the Petition, the Notice of Hearing of Petition, any affidavits filed in support of the Petition and this Order shall be made on the Federal and British Columbia Crowns in accordance with the Crown Liability and Proceedings Act, R.S.C. 1985, c. C-50, and regulations thereto, in respect of the Federal Crown, and the Crown Proceeding Act, R.S.B.C. 1996, c. 89, in respect of the British Columbia Crown.

**GENERAL**

47.     The Petitioner or the Monitor may from time to time apply to this Court for directions in the discharge of its powers and duties hereunder.

- 16 -

48.     Nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Petitioner, the Business or the Property.

49.     Each of the Petitioner and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Petitioner to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. §§ 101-1330, as amended.

50.     The Petitioner may (subject to the provisions of the CCAA and the BIA) at any time file a voluntary assignment in bankruptcy or a proposal pursuant to the commercial reorganization provisions of the BIA if and when the Petitioner determines that such a filing is appropriate.

51.     The Petitioner is hereby at liberty to apply for such further interim or interlocutory relief as it deems advisable within the time limited for Persons to file and serve Responses to the Petition.

52.     Leave is hereby granted to hear any application in these proceedings on two (2) clear days' notice after delivery to all parties on the Service List of such Notice of Application and all affidavits in support, subject to the Court in its discretion further abridging or extending the time for service.

53.     Any interested party (including the Petitioner and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to all parties on the Service List and to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

54.     Endorsement of this Order by counsel appearing on this application is hereby dispensed with.

55.     This Order and all of its provisions are effective as of 12:01 a.m. local Vancouver time on the Order Date.

- 17 -

THIS COURT REQUESTS the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court or administrative tribunal of any federal or State Court or administrative body in the United States of America, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Petitioner and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Petitioner and the Monitor and their respective agents in carrying out the terms of this Order.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of Lawyer for the Petitioner
McCarthy Tétrault LLP
(H. Lance Williams and Ashley Bowron)

_____ J.

BY THE COURT

REGISTRAR

Certified a true copy according to
the records of the Supreme Court
at Vancouver, B.C.
DATED:  DEC 1 8 2024

Authorized Signing Officer

Alora Bond

## SCHEDULE "A"

## LIST OF COUNSEL

| Counsel Name | Party Represented |
|---|---|
| H. Lanu Williams + Ashley Bowron | Felix Payment Systems Ltd. (Petitioner) |
| Mary Butteny KC + Lucas Hodgson | Proposed DIP Lender |
| Vicki Tickle | Alvarez - Marsal Canada Inc. |
| | |
| | |
| | |
| | |
| | |
| | |

# EXHIBIT B

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

DEC 0 6 2024

ENTERED

NO. S-248103
VANCOUVER REGISTRY

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36

AND

IN THE MATTER OF THE *BUSINESS CORPORATIONS ACT*, S.B.C. 2002, c. 57

AND

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
FELIX PAYMENT SYSTEMS LTD.

PETITIONER

SUPREME COURT
OF BRITISH COLUMBIA

S E A L

VANCOUVER
REGISTRY

## ORDER MADE AFTER APPLICATION
## (AMENDED AND RESTATED INITIAL ORDER)

| | | |
|---|---|---|
| BEFORE THE HONOURABLE | ) | FRIDAY, THE 6TH DAY |
| | ) | |
| JUSTICE MASUHARA | ) | OF DECEMBER, 2024 |

ON THE APPLICATION of the Petitioner, Felix Payment Systems Ltd., coming on for hearing at Vancouver, British Columbia on the 6th day of December, 2024; AND ON HEARING H. Lance Williams and Ashley Bowron, counsel for the Petitioner, and those other counsel listed on **Schedule "A"** hereto; AND UPON READING the material filed herein, including the First Affidavit of Andrew Cole, sworn November 21, 2024, the Pre-filing Report of Alvarez & Marsal Canada Inc. ("**A&M**") in its capacity as proposed monitor of the Petitioner, dated November 22, 2024, the Second Affidavit of Andrew Cole, sworn December 3 2024, the Third Confidential Affidavit of Andrew Cole, sworn December 3, 2024 (the "**Confidential Cole Affidavit**"), and the First Report of A&M in its capacity as monitor of the Petitioner (in such capacity, the "**Monitor**") dated December 5, 2024, 2024; AND UPON BEING ADVISED that the secured creditors who are likely to be affected by the charges created herein were given notice; AND pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36 as amended (the "**CCAA**"), the British Columbia Supreme Court Civil Rules, BC Reg 168/2009 and the inherent jurisdiction of this Honourable Court;

- 2 -

THIS COURT ORDERS AND DECLARES THAT:

1.     This amended and restated initial order ("**ARIO**") amends and restates the order of this Court made in these proceedings on November 25, 2024.

**SERVICE**

2.     The time for service of the Notice of Application, dated December 3, 2024 (the "**Notice of Application**") and supporting materials is hereby abridged such that the Notice of Application is properly returnable today.

**JURISDICTION**

3.     The Petitioner is a company to which the CCAA applies.

**CONTINUANCE UNDER THE CCAA**

4.     The proposal proceedings commenced by the Petitioner under Part III of the *Bankruptcy and Insolvency Act*, R.S.C. 1985 c. B-3, as amended (the "**BIA**") by filing a notice of intention to make a proposal (the "**NOI Proceeding**") on October 15, 2024 (the "**NOI Filing Date**") under Estate No. 11-3140093 and Court File No. VLC-S-B-240514 are hereby taken up and continued under the CCAA. The NOI Proceeding shall have no further force or effect, and is hereby terminated save that any and all acts, steps, agreements, and procedures validly taken, done, or entered into by the Petitioner during the NOI Proceeding shall remain valid, binding, and actionable within this proceeding (the "**CCAA Proceeding**"). For certainty, the approval of the Monitor's and its counsel's fees and disbursements, and approval of the Monitor's activities in the CCAA Proceeding shall be deemed approval of the fees, disbursements and activities of A&M in its capacity as the trustee of the proposal of the Petitioner (in such capacity, the "**Proposal Trustee**") and the fees and disbursements of the Proposal Trustee's counsel in the NOI Proceeding. The Petitioner is hereby authorized and directed to file a copy of this Order in the NOI Proceeding.

**PLAN OF ARRANGEMENT**

5.     The Petitioner shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "**Plan**").

- 3 -

## POSSESSION OF PROPERTY AND OPERATIONS

6.      Subject to this Order and any further Order of this Court, the Petitioner shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"), and continue to carry on its business (the "**Business**") in the ordinary course and in a manner consistent with the preservation of the Business and the Property. The Petitioner shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively, "**Assistants**") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for carrying out the terms of this Order.

7.      The Petitioner shall be entitled, but not required, to pay the following expenses which may have been incurred prior to the NOI Filing Date:

    (a)      all outstanding wages, salaries, employee and pension benefits (including long and short term disability payments), vacation pay and expenses (but excluding severance pay) payable before or after the NOI Filing Date, in each case incurred in the ordinary course of business and consistent with the relevant compensation policies and arrangements existing at the time incurred (collectively "**Wages**");

    (b)      the fees and disbursements of any Assistants retained or employed by the Petitioner which are related to the Petitioner's restructuring, at their standard rates and charges, including payment of the fees and disbursements of legal counsel retained by the Petitioner, whenever and wherever incurred, in respect of:

        (i)      the NOI Proceeding;

        (ii)     the CCAA Proceeding or any other similar proceedings in other jurisdictions in which the Petitioner or any subsidiaries or affiliated companies of the Petitioner are domiciled;

        (iii)    any litigation in which the Petitioner is named as a party or is otherwise involved, whether commenced before or after the NOI Filing Date;

- 4 -

      (iv)    any related corporate matters; and

(c)    such suppliers of good and services as are deemed critical for the preservation of the Property and/or Business with the consent of the Monitor.

8.    Except as otherwise provided herein, the Petitioner shall be entitled to pay all expenses reasonably incurred by the Petitioner in carrying on the Business in the ordinary course following the NOI Filing Date, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably incurred and which are necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services, provided that any capital expenditure exceeding $50,000 shall be approved by the Monitor;

(b)    all obligations incurred by the Petitioner after the NOI Filing Date, including without limitation, with respect to goods and services actually supplied to the Petitioner following the NOI Filing Date (including those under purchase orders outstanding at the NOI Filing Date but excluding any interest on the Petitioner's obligations incurred prior to the NOI Filing Date); and

(c)    fees and disbursements of the kind referred to in paragraph 7(b) which may be incurred after the NOI Filing Date.

9.    The Petitioner is authorized to remit, in accordance with legal requirements, or pay:

(a)    any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from Wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes or any such claims which are to be paid pursuant to Section 6(3) of the CCAA;

(b)    all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Petitioner in connection with the sale of goods and services by the Petitioner, but only where such Sales Taxes accrue or

- 5 -

are collected after the NOI Filing Date, or where such Sales Taxes accrued or were collected prior to the NOI Filing Date but not required to be remitted until on or after the NOI Filing Date; and

(c)   any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal property taxes, municipal business taxes or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors.

10.   Until such time as a real property lease is disclaimed in accordance with the CCAA, the Petitioner shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable as rent to the landlord under the lease) based on the terms of existing lease arrangements or as otherwise may be negotiated between the Petitioner and the landlord from time to time ("**Rent**"), for the period commencing from and including the Order Date, twice-monthly in equal payments on the first and fifteenth day of the month in advance (but not in arrears).  On the date of the first of such payments, any Rent relating to the period commencing from and including Order Date shall also be paid.

11.   Except as specifically permitted herein, the Petitioner is hereby directed, until further Order of this Court:

(a)   to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Petitioner to any of its creditors as of the NOI Filing Date except as authorized by this Order;

(b)   to make no payments in respect of any financing leases which create security interests;

(c)   to grant no security interests, trust, mortgages, liens, charges or encumbrances upon or in respect of any of its Property, nor become a guarantor or surety, nor otherwise become liable in any manner with respect to any other person or entity except as authorized by this Order;

(d)   to not grant credit except in the ordinary course of the Business only to its customers for goods and services actually supplied to those customers, provided

- 6 -

such customers agree that there is no right of set-off in respect of amounts owing for such goods and services against any debt owing by the Petitioner to such customers as of the NOI Filing Date; and

(e)     to not incur liabilities except in the ordinary course of Business.

**RESTRUCTURING**

12.     Subject to such requirements as are imposed by the CCAA and such covenants as may be contained in the Definitive Documents (as hereinafter defined), the Petitioner shall have the right to:

(a)     permanently or temporarily cease, downsize or shut down all or any part of its Business or operations and commence marketing efforts in respect of any of its redundant or non-material assets and to dispose of redundant or non-material assets not exceeding $50,000 in any one transaction or $100,000 in the aggregate;

(b)     terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate; and

(c)     pursue all avenues of refinancing for its Business or Property, in whole or part;

all of the foregoing to permit the Petitioner to proceed with an orderly restructuring of the Business (the "**Restructuring**").

13.     The Petitioner shall provide each of the relevant landlords with notice of the Petitioner's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal.  The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Petitioner's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors who claim a security interest in the fixtures, such landlord and the Petitioner, or by further Order of this Court upon application by the Petitioner, the landlord or the applicable secured creditors on at least two (2) clear days' notice to the other parties.  If the Petitioner disclaims the lease governing such leased premises in accordance with Section 32 of the CCAA, it shall not be required to pay Rent under such lease pending resolution of any dispute

- 7 -

concerning such fixtures (other than Rent payable for the notice period provided for in Section 32(5) of the CCAA), and the disclaimer of the lease shall be without prejudice to the Petitioner's claim to the fixtures in dispute.

14.     If a notice of disclaimer is delivered pursuant to Section 32 of the CCAA, then: (a) during the period prior to the effective time of the disclaimer, the landlord may show the affected leased premises to prospective tenants during normal business hours on giving the Petitioner and the Monitor 24 hours' prior written notice; and (b) at the effective time of the disclaimer, the landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims the landlord may have against the Petitioner, or any other rights the landlord might have, in respect of such lease or leased premises and the landlord shall be entitled to notify the Petitioner of the basis on which it is taking possession and gain possession of and re-lease such leased premises to any third party or parties on such terms as the landlord considers advisable, provided that nothing herein shall relieve the landlord of its obligation to mitigate any damages claimed in connection therewith.

15.     Pursuant to Section 7(3)(c) of the *Personal Information Protection and Electronics Documents Act*, S.C. 2000, c. 5 and Section 18(1)(o) of the *Personal Information Protection Act*, S.B.C. 2003, c. 63, and any regulations promulgated under authority of either Act, as applicable (the "**Relevant Enactment**"), the Petitioner, in the course of these proceedings, is permitted to, and hereby shall, disclose personal information of identifiable individuals in its possession or control to stakeholders, its advisors, prospective investors, financiers, buyers or strategic partners (collectively, "**Third Parties**"), but only to the extent desirable or required to negotiate and complete the Restructuring or to prepare and implement the Plan or transactions for that purpose; provided that the Third Parties to whom such personal information is disclosed enter into confidentiality agreements with the Petitioner binding them in the same manner and to the same extent with respect to the collection, use and disclosure of that information as if they were an organization as defined under the Relevant Enactment, and limiting the use of such information to the extent desirable or required to negotiate or complete the Restructuring or to prepare and implement the Plan or transactions for that purpose, and attorning to the jurisdiction of this Court for the purposes of that agreement.  Upon the completion of the use of personal information for the limited purposes set out herein, the Third Parties shall return the personal information to the Petitioner or destroy it.  If the Third Parties acquire personal information as part of the Restructuring or the preparation and implementation of the Plan or transactions in furtherance thereof, such Third Parties may, subject to this paragraph and any Relevant

- 8 -

Enactment, continue to use the personal information in a manner which is in all respects identical to the prior use thereof by the Petitioner.

**STAY OF PROCEEDINGS, RIGHTS AND REMEDIES**

16.     Until and including February 28, 2025, or such later date as this Court may order (the "**Stay Period**"), no action, suit or proceeding in any court or tribunal (each, a "**Proceeding**") against or in respect of the Petitioner or the Monitor, or affecting the Business or the Property, shall be commenced or continued except with the written consent of the Petitioner and the Monitor or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Petitioner or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

17.     During the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Petitioner or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Petitioner and the Monitor or leave of this Court.

18.     Nothing in this Order, including paragraphs 16 and 17, shall: (i) empower the Petitioner to carry on any business which the Petitioner is not lawfully entitled to carry on; (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA; (iii) prevent the filing of any registration to preserve or perfect a mortgage, charge or security interest (subject to the provisions of Section 39 of the CCAA relating to the priority of statutory Crown securities); or (iv) prevent the registration or filing of a lien or claim for lien or the commencement of a Proceeding to protect lien or other rights that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such lien, claim for lien or Proceeding except for service of the initiating documentation on the Petitioner.

**NO INTERFERENCE WITH RIGHTS**

19.     During the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Petitioner, except with the written consent of the Petitioner and the Monitor or leave of this Court.

- 9 -

## CONTINUATION OF SERVICES

20.        During the Stay Period, all Persons having oral or written agreements with the Petitioner or mandates under an enactment for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Petitioner, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with, or terminating the supply of such goods or services as may be required by the Petitioner, and that the Petitioner shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the NOI Filing Date are paid by the Petitioner in accordance with normal payment practices of the Petitioner or such other practices as may be agreed upon by the supplier or service provider and the Petitioner and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

21.        Notwithstanding any provision in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the NOI Filing Date, nor shall any Person be under any obligation to advance or re-advance any monies or otherwise extend any credit to the Petitioner on or after the NOI Filing Date. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

22.        During the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against the directors or officers of the Petitioner with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Petitioner whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Petitioner, if one is filed, is sanctioned by this Court or is refused by the creditors of the Petitioner or this Court. Nothing in this Order, including in this paragraph, shall prevent the commencement of a Proceeding to preserve any claim against a director or officer of the Petitioner that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall

- 10 -

be taken in respect of such Proceeding except for service of the initiating documentation on the applicable director or officer.

## DIRECTORS AND OFFICERS INDEMNIFICATION AND CHARGE

23.     The Petitioner shall indemnify its directors and officers against obligations and liabilities that they may incur as directors or officers of the Petitioner after the commencement of the within proceedings , except to the extent that, with respect to any director or officer, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

24.     The directors and officers of the Petitioner shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of $150,000, as security for the indemnity provided in paragraph 23 of this Order. The Directors' Charge shall have the priority set out in paragraphs 44 and 46 herein.

25.     Notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) the Petitioner's directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

## APPOINTMENT OF MONITOR

26.     Alvarez & Marsal Canada Inc. ("**A&M**") is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Petitioner with the powers and obligations set out in the CCAA or set forth herein, and that the Petitioner and its shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Petitioner pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

27.     The Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

- 11 -

(a)     monitor the Petitioner's receipts and disbursements;

(b)     report to this Court at such times and intervals as the Monitor may deem
        appropriate with respect to matters relating to the Property, the Business, and
        such other matters as may be relevant to the proceedings herein;

(c)     assist the Petitioner, to the extent required by the Petitioner, in its dissemination,
        to the DIP Lender (as hereinafter defined)  and its counsel on a bi-weekly basis
        of financial and other information as agreed to between the Petitioner and the
        DIP Lender which may be used in these proceedings including reporting on a
        basis to be agreed with the DIP Lender;

(d)     advise the Petitioner in its preparation of the Petitioner's cash flow statements
        and reporting required by the DIP Lender, which information shall be reviewed
        with the Monitor and delivered to the DIP Lender and its counsel on a periodic
        basis, but not less than bi-weekly, or as otherwise agreed to by the DIP Lender;

(e)     advise the Petitioner in its development of the Plan and any amendments to the
        Plan;

(f)     assist the Petitioner, to the extent required by the Petitioner, with the holding and
        administering of creditors' or shareholders' meetings for voting on the Plan;

(g)     have full and complete access to the Property, including the premises, books,
        records, data, including data in electronic form, and other financial documents of
        the Petitioner, to the extent that is necessary to adequately assess the
        Petitioner's business and financial affairs or to perform its duties arising under
        this Order;

(h)     be at liberty to engage independent legal counsel or such other persons as the
        Monitor deems necessary or advisable respecting the exercise of its powers and
        performance of its obligations under this Order; and

(i)     perform such other duties as are required by this Order or by this Court from time
        to time.

- 12 -

28.    The Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, or by inadvertence in relation to the due exercise of powers or performance of duties under this Order, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof, and nothing in this Order shall be construed as resulting in the Monitor being an employer or a successor employer, within the meaning of any statute, regulation or rule of law or equity, for any purpose whatsoever.

29.    Nothing herein contained shall require or allow the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Fisheries Act*, the British Columbia *Environmental Management Act*, the British Columbia *Fish Protection Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. For greater certainty, the Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.    The Monitor shall provide any creditor of the Petitioner and the DIP Lender with information provided by the Petitioner in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Petitioner is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Petitioner may agree.

31.    In addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, its appointment as the Proposal Trustee, or

- 13 -

the carrying out of its role as the Proposal Trustee, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the rights and protections afforded the Monitor or the Proposal Trustee by the CCAA, the BIA, or any applicable legislation.

## ADMINISTRATION CHARGE

32.     The Monitor, counsel to the Monitor, if any, and counsel to the Petitioner shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the Petitioner as part of the cost of these proceedings. The Petitioner is hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor and counsel to the Petitioner on a periodic basis. The prior payment by the Petitioner of retainers to the Monitor, counsel to the Petitioner, and counsel to the Monitor in the amounts of $75,000, $75,000 and $50,000, respectively are hereby authorized, such retainers to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

33.     The Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the British Columbia Supreme Court who may determine the manner in which such accounts are to be passed, including by hearing the matter on a summary basis or referring the matter to a Registrar of this Court.

34.     The Monitor, counsel to the Monitor, if any, and counsel to the Petitioner shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of $250,000, as security for their respective fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order which are related to the Petitioner's restructuring. The Administration Charge shall have the priority set out in paragraphs 44 and 46 hereof.

## INTERIM FINANCING

35.     The Petitioner is hereby authorized and empowered to obtain and borrow under a credit facility from Mr. Jake Boxer, the CA Mordy Legacy Trust, and PEL Chartered Professional Accountants Inc. (collectively, the "**DIP Lender**") in order to finance the continuation of the Business and preservation of the Property.

- 14 -

36.     Such credit facility shall be on the terms and subject to the conditions set forth in the commitment letter between the Petitioner and the DIP Lender dated as of November 21, 2024, *as amended December 3, 2024* (the "**Commitment Letter**"), filed.

37.     The Petitioner is hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, the "**Definitive Documents**"), as are contemplated by the Commitment Letter or as may be reasonably required by the DIP Lender pursuant to the terms thereof, and the Petitioner is hereby authorized and directed to pay and perform all of its indebtedness, interest, fees, liabilities and obligations to the DIP Lender under and pursuant to the Commitment Letter and the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

38.     The DIP Lender shall be entitled to the benefit of and is hereby granted a charge (the "**DIP Lender's Charge**") on the Property. The DIP Lender's Charge shall not secure an obligation that exists before this Order is made. The DIP Lender's Charge shall have the priority set out in paragraphs 44 and 46 hereof.

39.     Notwithstanding any other provision of this Order:

(a)     the DIP Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lender's Charge or any of the Definitive Documents;

(b)     upon the occurrence of an event of default under any of the Definitive Documents or the DIP Lender's Charge, the DIP Lender, upon five (5) business days notice to the Petitioner and the Monitor, may exercise any and all of its rights and remedies against the Petitioner or the Property under or pursuant to the Commitment Letter, Definitive Documents and the DIP Lender's Charge, including without limitation, to cease making advances to the Petitioner and set off and/or consolidate any amounts owing by the DIP Lender to the Petitioner against the obligations of the Petitioner to the DIP Lender under the Commitment Letter, the Definitive Documents or the DIP Lender's Charge, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a

- 15 -

bankruptcy order against the Petitioner and for the appointment of a trustee in bankruptcy of the Petitioner; and

(c)    the foregoing rights and remedies of the DIP Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Petitioner or the Property.

40.    The DIP Lender, in such capacity, shall be treated as unaffected in any plan of arrangement or compromise filed by the Petitioner under the CCAA, or any proposal filed by the Petitioner under the BIA, with respect to any advances made under the Definitive Documents.

**KEY EMPLOYEE RETENTION PLAN**

41.    The Key Employee Retention Plan (the "**KERP**"), an unredacted copy of which is attached as Exhibit "A" to the Confidential Cole Affidavit, is hereby approved and the Petitioner is authorized to make payments contemplated thereunder in accordance with the terms and conditions of the KERP.

42.    The payments made by the Petitioner pursuant to the KERP do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

43.    The key employees referred to in the KERP (the "**Eligible Employees**") shall be entitled to the benefit of and are hereby granted a charge on the Property (the "**KERP Charge**"), which charge shall not exceed an aggregate amount of $95,000 to secure any payments to the Key Employees under the KERP. The KERP Charge shall have the priority set out in paragraphs 44 and 46 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

44.    The priorities of the Administration Charge, the DIP Lender's Charge, the Directors' Charge, and the KERP Charge (collectively, the "**Charges**"), as among them, shall be as follows:

First – Administration Charge (to the maximum amount of $250,000);

Second –  DIP Lender's Charge;

- 16 -

Third -  Directors' Charge (to the maximum amount of $150,000);

Fourth – KERP Charge (to the maximum amount of $95,000).

45.     Any security documentation evidencing, or the filing, registration or perfection of, the Charges shall not be required, and that the Charges shall be effective as against the Property and shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered or perfected subsequent to the Charges coming into existence, notwithstanding any failure to file, register or perfect any such Charges.

46.     Each of the Charges shall constitute a mortgage, security interest, assignment by way of security and charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, mortgages, charges and encumbrances and claims of secured creditors, statutory or otherwise, but excluding the security interest of Royal Bank of Canada in relation certain amounts held on deposit with them and registered in the Personal Property Registry of British Columbia as Base Registration No. 355037N (collectively, "**Encumbrances**"), in favour of any Person, save and except those claims contemplated by section 11.8(8) of the CCAA.

47.     Except as otherwise expressly provided herein, or as may be approved by this Court, the Petitioner shall not grant or suffer to exist any Encumbrances over any Property that rank in priority to, or *pari passu* with the Charges, unless the Petitioner obtains the prior written consent of the Monitor, the DIP Lender and the beneficiaries of the Administration Charge and the Director's Charge.

48.     The Charges and the Definitive Documents shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Lender shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, mortgage, security agreement, debenture, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Petitioner; and notwithstanding any provision to the contrary in any Agreement:

- 17 -

    (a)    neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Commitment Letter or the Definitive Documents shall create or be deemed to constitute a breach by the Petitioner of any Agreement to which it is a party;

    (b)    none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Petitioner entering into the Commitment Letter, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

    (c)    the payments made by the Petitioner pursuant to this Order, the Commitment Letter or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

49.    Any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Petitioner's interest in such real property leases.

**SERVICE AND NOTICE**

50.    The Monitor shall (i) without delay, publish in the Globe & Mail a notice containing the information prescribed under the CCAA, (ii) within five days after Order Date, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a notice to every known creditor who has a claim against the Petitioner of more than $1000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

51.    The Petitioner and the Monitor are at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Petitioner's creditors or other interested parties at their respective addresses as last shown on the records of the Petitioner and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

- 18 -

52.      Any Person that wishes to be served with any application and other materials in these proceedings must deliver to the Monitor by way of ordinary mail, courier, personal delivery or electronic transmission a request to be added to a service list (the "**Service List**") to be maintained by the Monitor. The Monitor shall post and maintain an up to date form of the Service List on its website at: www.alvarezandmarsal.com/felixpayment.

53.      Any party to these proceedings may serve any court materials in these proceedings by emailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, and the Monitor shall post a copy of all prescribed materials on its website at: www.alvarezandmarsal.com/felixpayment.

54.      Notwithstanding paragraphs 51 and 53 of this Order, service of the Petition, the Notice of Hearing of Petition, any affidavits filed in support of the Petition and this Order shall be made on the Federal and British Columbia Crowns in accordance with the *Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50, and regulations thereto, in respect of the Federal Crown, and the *Crown Proceeding Act*, R.S.B.C. 1996, c. 89, in respect of the British Columbia Crown.

**GENERAL**

55.      The Petitioner or the Monitor may from time to time apply to this Court for directions in the discharge of its powers and duties hereunder.

56.      Nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Petitioner, the Business or the Property.

57.      Each of the Petitioner and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and either the Petitioner or the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Petitioner to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. §§ 101-1330, as amended.

- 19 -

58.     The Petitioner may (subject to the provisions of the CCAA and the BIA) at any time file a voluntary assignment in bankruptcy or a proposal pursuant to the commercial reorganization provisions of the BIA if and when the Petitioner determines that such a filing is appropriate.

59.     The Petitioner is hereby at liberty to apply for such further interim or interlocutory relief as it deems advisable within the time limited for Persons to file and serve Responses to the Petition.

60.     Leave is hereby granted to hear any application in these proceedings on two (2) clear days' notice after delivery to all parties on the Service List of such Notice of Application and all affidavits in support, subject to the Court in its discretion further abridging or extending the time for service.

61.     Any interested party (including the Petitioner and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to all parties on the Service List and to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

62.     Endorsement of this Order by counsel appearing on this application is hereby dispensed with.

63.     This Order and all of its provisions are effective as of 12:01 a.m. local Vancouver time on the Order Date.

THIS COURT REQUESTS the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court or administrative tribunal of any federal or State Court or administrative body in the United States of America, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Petitioner and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Petitioner and the Monitor and their respective agents in carrying out the terms of this Order.

BY THE COURT

REGISTRAR

ENDORSEMENTS ATTACHED

Certified a true copy according to the records of the Supreme Court at Vancouver, B.C.,
DATED: DEC 1 8 2024
Authorized Signing Officer
Alora Bond

S248103

- 20 -

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO
EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____

Signature of Lawyer for the Petitioner
McCarthy Tétrault LLP
(H. Lance Williams and Ashley Bowron)

BY THE COURT

_____

REGISTRAR

## SCHEDULE "A"

## LIST OF COUNSEL

| Counsel Name | Party Represented |
|---|---|
| H. Lance Williams + Ashley Bowron | Petitioner |
| Vicki Tickle | Monitor |
| Emma Newbery | DIP lender |
| David Gruber | Second Lien lenders |
| | |
| | |
| | |
| | |
| | |



EXHIBIT C

This is the 1st affidavit of
Andrew Cole in this case and
was made on November 21, 2024

$S \equiv 2\ 48\ 1\ 0\ 3$

NO. _____
VANCOUVER REGISTRY

## IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36

AND

IN THE MATTER OF THE *BUSINESS CORPORATIONS ACT*, S.B.C. 2002, c. 57

AND

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
FELIX PAYMENT SYSTEMS LTD.

PETITIONER

## **A F F I D A V I T**

I, **Andrew Cole**, business person, of 1400-355 Burrard Street, Vancouver, British Columbia,
SWEAR THAT:

### I.    INTRODUCTION

1.    In October 2024, I was appointed and remain the Chief Executive Officer of Felix Payment
Systems Ltd. ("**Felix**"). Prior to that, I was the Chief Financial Officer of Felix from mid-2021 to
October 2024. I have been involved in the restructuring efforts of Felix to date. Where necessary,
I have also reviewed the books and records maintained by Felix in the ordinary course of
business. As such, I have personal knowledge of the matters described in this affidavit, except
where I say that my knowledge is based on information from others, in which case, I believe the
same to be true.

2.    This affidavit is sworn in support of a petition by Felix dated November 21, 2024 for an
initial order under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c C-36 (the "**CCAA**")
substantially in the form attached as Schedule "A" to the petition to be filed with this Court
concurrently with my affidavit (the "**Initial Order**").

3.    All references to currency in this affidavit are in Canadian dollars unless noted otherwise.

- 2 -

## II.    OVERVIEW

4.      Felix is a privately-held financial technology company based in Vancouver, British Columbia specializing in cloud-based payment acceptance infrastructure and associated software systems. On October 15, 2024, (the "**NOI Filing Date**"), Felix filed a notice of intention to make a proposal (the "**NOI**") under the *Bankruptcy and Insolvency Act*, R.S.C., 1985 c. B-3 (the "**BIA**"), which commenced the NOI proceeding (the "**NOI Proceeding**"). Alvarez & Marsal Canada Inc. ("**A&M**") was appointed to act as the proposal trustee (in such capacity, the "**Proposal Trustee**"). On November 12, 2024, this Court (sitting in bankruptcy and insolvency) granted Felix an extension of time to file a proposal to December 30, 2024.

5.      Felix remains insolvent as of the date of this affidavit. Felix is in a liquidity crisis and, absent the approval of the additional financing proposed to be made available under the debtor-in-possession credit facility (the "**DIP Facility**"), Felix will not be able to meet its post-NOI Filing Date obligations as they become due. Further, the nature of the issues facing Felix (discussed below) require the greater flexibility afforded by CCAA proceedings.

6.      This restructuring is required to address several issues facing Felix, and I believe that such a proceeding is in the best interests of all of Felix's stakeholders:

      (a)      there has been a breakdown in the relationship between the existing lenders/equity holders of Felix, and as such, no party is prepared to inject further financing under the current structure. In order to preserve the value of Felix's business, it is necessary to commence a sales and investment solicitation process (the "**SISP**") to restructure the ownership and financing structure of Felix's business; and

      (b)      the nature of the debt, security and status of enforcement against Felix's assets is in dispute, and needs to be addressed and confirmed expeditiously in a court-supervised process.

7.      Given the nature of Felix's business as an early-stage technology company, there is likely little to no value for stakeholders in a liquidation. Further, without addressing these issues expeditiously, any residual value is likely further compromised. Consequently, Felix is requesting this Court continue the NOI Proceeding as a proceeding under the CCAA (the "**CCAA Proceeding**") so that the adverse consequences associated with a bankruptcy can be avoided.

The conversion to a CCAA Proceeding is intended to benefit all of Felix's stakeholders, including the company's many employees, customers, suppliers, creditors, and other contracting parties.

8.      Mr. Jake Boxer, the CA Mordy Legacy Trust (the "**Mordy Trust**"), and PEL Chartered Professional Accountants Inc. have collectively agreed to provide additional financing to Felix to fund the restructuring process through the DIP Facility (in their capacity as lenders in this proceeding collectively, the "**DIP Lender**") to, among other things, provide Felix with the immediate access to funding needed to continue to operate and preserve the value of its operations. As noted below, Felix does not produce sufficient revenues at this stage of its development to fund its operations, and as a technology-based business, its value is as a going-concern.

### III.    CORPORATE STRUCTURE AND MANAGEMENT

#### a.    Felix's Product

9.      Felix has developed a novel cloud-based payment acceptance infrastructure and associated software system that transforms non-traditional hardware into a certified payment terminal. Felix's payment acceptance technology enables contactless payments on near-field communication-enabled devices without the need for additional hardware, making payment acceptance more accessible for all businesses. This technology allows payment terminals to be put on non-traditional hardware, such as cellphone or tablets, through a software application. Felix's value proposition is that it brings to market a method for offloading the 'payment engine' for processing electronic payments to a cloud environment and entirely off-device. This makes the payment acceptance method for businesses more flexible and easier to integrate with a variety of devices.

10.     In particular, Felix allows its end users to access the software via its Android application or integration into another software product with its Software Development Kit (the "**SDK**"). The flexibility of Felix's SDK means it can be integrated into other software and is easier to work with than other systems. In addition to the initial deployment and integration of the software platform with customers, Felix is responsible for maintaining the cloud environment and all necessary certifications to operate a financial services technology. Because of the sensitive nature of the data being transmitted, certain certifications are required by payment processors and payment networks (e.g. VISA and MasterCard) to ensure sufficient security in the software. Felix has or is in the process of completing a number of these certifications, which are discussed below.

- 4 -

Additionally, Felix provides support outlined in their applicable customer service level agreements.

11.      Unlike its competition, Felix's payment platform caters to mid- and large-sized businesses because it can be adapted and deployed in more sophisticated software environments. The unique payment acceptance technology reduces certification overhead, device maintenance, and dependency on traditional terminal providers for businesses, and enables businesses of all sizes to accept payments everywhere. As Felix's platform is pre-certified for major payment processors and payment networks, it reduces certification delays and costs that businesses would otherwise incur.

12.      To market its product, Felix contracts with channel partners, rather than a more traditional direct-to-end user strategy. Felix sells its services via four primary categories of channel partners (the "**Channel Partners**"): original equipment manufacturers, independent software vendors, and financial institutions and their agents. Felix maintains contracts with its Channel Partners for referral business as well as contracts with the end-user businesses.

13.      Felix's contracts with the Channel Partners typically generate revenue via a combination of two mechanisms: (i) a recurring SaaS License Fee charged monthly per device utilising the Felix system; and (ii) a transaction fee charged per individual transaction. Additionally, Felix imposes one-time implementation and set-up fees for each deployment.

### b.      History and Ownership of Felix

14.      In 2017, Owen Newport, Warren Hogg, Kieran Moloney, Sean Dennis, Oliver Ransford and Jay Donovan (the "**Founders**") founded an Australian company called Gentek Global PTY Ltd. ("**Gentek**"). In March 2020, the Founders relocated all of Gentek operations to Canada and incorporated Felix in British Columbia. Gentek's intellectual property was transferred to and is now held by Felix. Ultimately, in 2023, Gentek was closed. Attached hereto as **Exhibit "A"** is a true copy of the corporate registry search with respect to Felix, as at November 18, 2024.

15.      According to the books and records of Felix, the company is privately owned by 23 shareholders. Its largest shareholder, Mr. Jake Boxer, holds approximately 18% of the outstanding shares. Mr. Boxer is an original seed investor in Felix with Mr. Doug Mordy, who together hold approximately 30% of the outstanding shares. A copy of the Central Securities Register as of August 31, 2023 is attached hereto as **Exhibit "B"**.

16.    In July 2020, PayFelix Inc. was incorporated in Delaware to facilitate interactions with US-based investors and commercial partners. PayFelix Inc. is not part of the current business and to the best of my knowledge, has never been used and has no assets or liabilities. In January 2023, Felix Payment Systems US Ltd. ("**Felix US**") was incorporated in Delaware to serve US customers. Although Felix US remains a 100% owned subsidiary of Felix, it has not recognized any revenue or accumulated any assets to date.

c.    **Corporate Structure**

17.    The following is a copy of Felix's current corporate structure:



18.    Felix is the only applicant in the CCAA Proceeding and operates from its headquarters at 1400-355 Burrard Street, Vancouver, BC, V6B 2G8. Felix is the borrower under all credit facilities and is the centralized entity through which the company's cash needs are managed.

d.    **Employees**

19.    Felix employs 32 people. Felix US has no employees. Felix has two directors, both of whom are based in Vancouver, British Columbia. Over 85% of the employees at Felix work on the technology team. The technology team is divided into four subgroups:

(a)    the Cloud Services team develops and maintains Felix's cloud back-end production environment and the core communication logic of Felix's overarching solution with other systems;

(b)    the Infrastructure team provides technical support for any of the business needs other than cloud services.

- 6 -

    (c)     the Client Services team handles any client-facing operations; and

    (d)     the Database & Portal team handles the database for Felix's product information storage and the device management and reporting tool Felix provides its customers.

20.    The largest group within the technology team is Cloud Services, with 12 employees. The aggregate payroll for Felix is approximately $260,000 per month (excluding the cost of benefits).

21.    All of Felix's employees are non-unionized and there are no pensions, retirement, or deferred compensation plans for their benefit. Through its benefits provider, Victor Insurance, Felix sponsors a group benefit plan offering extended health care, dental care, counselling services, and long-term disability benefits (among other things) to its employees.

22.    In April 2023, Felix initiated an Employee Share Option Program (the "**ESOP**") for certain eligible employees, allowing them to receive common shares of Felix. The ESOP was implemented in response to requests from key employees who desired ownership in the company and, as a pre-profit company, the ESOP was also intended to serve as a non-cash incentive program to promote employee retention. While options were issued under the program, no shares were issued under the ESOP.

    e.    **Real Property**

23.    Felix has one sublease agreement for its office space located at 1400-355 Burrard Street, with estimated annual payments of approximately $326,730. In an effort to cut costs earlier this year, Felix relocated to this address because the sublease ends on August 31, 2025 and, therefore, reduces long-term fixed costs because the shorter lease provided Felix with a favourable lease rate.

    f.    **Accounts and Credit Card**

24.    Felix maintains three bank accounts, one credit card, and one guaranteed investment certificate with the Royal Bank of Canada ("**RBC**"). Two of the accounts are with RBC Canada, one in Canadian dollars and one in American dollars. One of the accounts is with RBC US, in American dollars, and is maintained to facilitate the receipt of funds from partners in the United States. The guaranteed investment certificate is held with RBC for $20,000 and secures Felix's credit card obligations with RBC.

25.     Payroll payments are made using Payworks Inc., a workforce management application. Payroll amounts are transferred to Payworks, who then deposits them in the employees' accounts.

       **g.**     **Intellectual Property**

26.     As a financial technology company, Felix is in the process of protecting its intellectual property to ensure the value of its key asset: its intellectual property. To further that goal, on May 7, 2021, Felix submitted applications under the international Patent Cooperation Treaty and four national patent applications in Canada, United Kingdom, Australia, and the United States, which are as follows:

     (a)     WO2021223036 - SYSTEMS AND METHODS FOR CENTRALIZED AUTHENTICATION OF FINANCIAL TRANSACTIONS. International Application No. PCT/CA2021/050644 under the Patent Cooperation Treaty.

     (b)     Canadian Patent Application Serial No. 3,175,247. SYSTEMS AND METHODS FOR CENTRALIZED AUTHENTICATION OF FINANCIAL TRANSACTIONS.

     (c)     United Kingdom Patent Application No. 2217516.0. National Phase Entry of PCT/CA2021/050644. SYSTEMS AND METHODS FOR CENTRALIZED AUTHENTICATION OF FINANCIAL TRANSACTIONS.

     (d)     United States Patent Application Serial No. 17/996,200, National Phase Entry of PCT/CA2021/050644. SYSTEMS AND METHODS FOR CENTRALIZED AUTHENTICATION OF FINANCIAL TRANSACTIONS.

     (e)     Australian Application No. 2021267568, Systems and methods for centralized authentication of financial transactions.

## IV.     FINANCIAL POSITION OF FELIX

27.     A copy of Felix's condensed interim statement of financial position as at September 30, 2024 is attached hereto as **Exhibit "C"**. Certain information contained in that unaudited balance sheet is summarized below.

28.     The following is a summary of Felix's financial position based on the available books and records. I have also reviewed the records and emails of departed employees. Felix has continued

- 8 -

to review and refine the information available with respect to the nature and quantum of its obligations since the NOI Filing Date. Given the start-up nature of Felix's business, and the liquidity issues that Felix has faced, its books and records require updating. For example, many of the outstanding amounts in the books and records do not include accrued interest. Some of the litigation claims discussed in paragraph 71 below include disputes regarding documentation that was allegedly signed by Felix, and therefore, Felix requires additional time to review all of its documents before providing a more definitive summary of Felix's outstanding obligations. To the best of my knowledge, the below reflects Felix's present financial position based on the information I have been able to locate. Given the disputed nature of the debts and security, it is anticipated that a limited claims process may be necessary as part of or in conjunction with the SISP to confirm the amount, validity, and priority of any outstanding obligations.

    a.    **Assets**

29.    As at September 30, 2024, Felix had total unconsolidated assets with a book value of approximately $653,291.05, which consisted primarily of the following:

| Asset Type | Book Value (Consolidated) |
| --- | --- |
| Cash | $19,063.88 |
| Accounts Receivable | $189,939.76 |
| Tax Credits and Grants | $25,281.58 |
| Prepaid Expenses | $353,449.15 |
| Equipment | $36,807.20 |
| Long Term Investment | $20,000 |
| Related Party | $7,243.57 |
| Other Assets | $1,504.91 |
| Investment in Subsidiary | $1 |
| **Total** | **$653,291.05** |

- 9 -

30.     As noted above, Felix is a start-up technology company, so the net realizable value of the assets on liquidation may be less than the book value. However, it is anticipated that the value of Felix's business, especially once certifications are complete, will greatly exceed book value.

**b.     Liabilities**

31.     As at September 30, 2024, Felix had total unconsolidated liabilities with a book value owing of approximately $19,005,102.01, which consisted primarily of the following:

| Liabilities Type | Book Value (Consolidated) |
|---|---|
| Accounts Payable & Accrued Expenses | $1,316,020.10 |
| Payroll Liabilities | $56,947.10 |
| Deferred Revenue | $406,445.72 |
| Shareholder Loans | $4,093,605.34 |
| Non-Related Party Debt | $11,389,201.84 |
| Long Term Debt | $320,650.00 |
| Accrued Interest | $1,422,231.91 |
| **Total** | **$19,005,102.01** |

**c.     Secured Obligations**

32.     Felix's primary secured creditors can be categorized in two groups: (i) the first lien lenders—Mr. Boxer and Mr. Mordy and their associated entities, which include Brookridge Chartered Professional Accounts Inc ("**Brookridge**"), the Mordy Trust, Candice Rose Mordy, Ralph McFee, Kapil Nanalal, and Section 3 Ventures (VCC) Inc. (collectively, the "**First Lien Lenders**"); and (ii) the second lien lenders—Mr. Steve Hall and his associated entities, which include SR Hall Management LLC ("**SR Hall**"), BBSG Hall Investments, LLC ("**BBSG**"), Ripcord Capital LLC ("**Ripcord**"), and DapIt NA, LLC ("**DapIt**", together with SR Hall, BBSG, and Ripcord, the "**Second Lien Lenders**").

33.     The First Lien Lenders and the Second Lien Lenders have each registered a security interest in Felix's present and after-acquired personal property. A copy of the British Columbia

Personal Property Registry Search (the "**PPR Search**") for Felix is attached hereto as **Exhibit "D"**. According to the PPR Search, the First Lien Lenders registered their security interest in January and February 2024 and the Second Lien Lenders registered their security interest in August 2024. As discussed in more detail below, the First Lien Lenders have security agreements securing their interest. Felix has no record of and has been unable to locate any similar agreement with the Second Lien Lenders that grants a security in all present and after acquired property, but expects to address those (and their scope) as part of a claims process.

        i.    <u>First Lien Lenders</u>

34.    As of November 15, 2024, the books and records indicate that Mr. Boxer is owed approximately $2.3 million (this likely does not account for all interest and fees) pursuant to the following documents:

    (a)    Demand Promissory Note dated June 25, 2021 for $150,000 attached hereto as **Exhibit "E"**;

    (b)    Demand Promissory Note dated November 25, 2022 for $500,000 attached hereto as **Exhibit "F"**;

    (c)    Demand Promissory Note dated December 29, 2022 for $300,000 attached hereto as **Exhibit "G"**;

    (d)    Demand Promissory Note dated February 7, 2023 for $250,000 attached hereto as **Exhibit "H"**;

    (e)    Secured Promissory Note dated February 10, 2024 for $60,000 attached hereto as **Exhibit "I"**;

    (f)    Secured Promissory Note dated February 28, 2024 for $66,000 attached hereto as **Exhibit "J"**;

    (g)    Secured Promissory Note dated March 14, 2024 for $60,000 attached hereto as **Exhibit "K"**; and

    (h)    Amended and Restated Demand Loan Agreement between Mr. Boxer, as lender, and Felix, as borrower, dated March 27, 2024 attached hereto as **Exhibit "L"** (the "**Boxer Loan and Security Agreement**"), which indicated that, as of the date of

the agreement, Mr. Boxer was owed $1,386,000 in principal amounts and $278,062.81 in interest pursuant to the series of promissory notes issued from time to time by Mr. Boxer to Felix. Pursuant to the Boxer Loan and Security Agreement, Mr. Boxer advanced a further $30,000 and authorized Felix to request subsequent advances in accordance with the grid set out in Schedule A to the agreement.

35.     Mr. Boxer's claims are secured by:

(a)     the Boxer Loan and Security Agreement, which secures all past and future indebtedness of Felix to Mr. Boxer; and

(b)     a General Security Agreement, between Mr. Boxer, as the secured party, and Felix, as grantor, dated February 10, 2024 and attached hereto as **Exhibit "M"**.

36.     As of November 15, 2024, the books and records indicate that Mr. Mordy and the Mordy Trust are collectively owed approximately $639,000 (this likely does not account for all interest and fees) pursuant to the following documents:

(a)     Demand Promissory Note to Mordy Trust dated August 6, 2021 for $200,000 attached hereto as **Exhibit "N"**;

(b)     Demand Promissory Note to Mordy Trust dated January 10, 2023 for $200,000 attached hereto as **Exhibit "O"**;

(c)     Demand Promissory Note to Mordy Trust dated February 6, 2023 for $100,000 attached hereto as **Exhibit "P"**;

(d)     Demand Promissory Note to Mordy Trust dated February 9, 2023 for $75,000 attached hereto as **Exhibit "Q"**;

(e)     Secured Promissory Note to Mordy Trust dated February 10, 2024 for $30,000 attached hereto as **Exhibit "R"**;

(f)     Secured Promissory Note to Mordy Trust dated February 28, 2024 for $31,000 attached hereto as **Exhibit "S"**;

(g)    Secured Demand Promissory Note to Mordy Trust dated March 14, 2024 for $30,000 attached hereto as **Exhibit "T"**; and

(h)    Amended and Restated Demand Loan Agreement between Mordy Trust, as lender, and Felix, as borrower, dated March 27, 2024 attached hereto as **Exhibit "U"** (the "**Mordy Loan and Security Agreement**") which amends the Demand Loan Agreement between Doug Mordy, Candice Rose Mordy, Ralph Kurt McFee, Section 3 Ventures (VCC) Inc., and Kapil Nanalal, as lenders, and Felix as borrower, dated March 27, 2024, attached hereto as **Exhibit "V"**. The Mordy Loan and Security Agreement indicated that, as of the date of the agreement, the Mordy Trust was owed $666,000 in principal amounts and $158,576.61 in interest pursuant to the series of promissory notes issued from time to time by Mr. Mordy to Felix. Pursuant to the Boxer Loan and Security Agreement, Mr. Boxer advanced a further $15,000 and authorized Felix to request subsequent advances in accordance with the grid set out in Schedule A to the agreement.

37.    Mr. Mordy and the Mordy Trust's claims are secured by:

(a)    the Mordy Loan and Security Agreement, which secures all past and future indebtedness of Felix to the Mordy Trust;

(b)    a General Security Agreement between Doug Mordy, Candice Rose Mordy, Ralph Kurt McFee, Section 3 Ventures (VCC) Inc., and Kapil Nanalal, as lenders, and Felix as borrower, dated March 27, 2024, attached hereto as **Exhibit "W"**; and

(c)    a General Security Agreement between the Mordy Trust, as the secured party, and Felix, as grantor, dated February 10, 2024, attached hereto as **Exhibit "X"**.

38.    As of November 15, 2024, the books and records indicate that Brookridge is owed approximately $314,000 (this likely does not account for all interest and fees) pursuant to the following documents:

(a)    Demand Promissory Note to Brookridge dated October 7, 2022 for $200,000 attached hereto as **Exhibit "Y"**;

(b)    Secured Promissory Note to Brookridge dated February 10, 2024 for $10,000 attached hereto as **Exhibit "Z"**;

(c)   Secured Promissory Note to Brookridge dated February 28, 2024 for $13,000 attached hereto as **Exhibit "AA"**;

(d)   Secured Demand Promissory Note to Brookridge dated March 14, 2024 for $10,000 attached hereto as **Exhibit "BB"**; and

(e)   Amended and Restated Demand Loan Agreement between Brookridge, as lender, and Felix, as borrower, dated March 27, 2024 attached hereto as **Exhibit "CC"** (the "**Brookridge Loan and Security Agreement**"), which indicated that, as of March 27, 2024, Brookridge was owed $233,000 in principal amounts and $46,649.59 in interest. Pursuant to the Brookridge Loan and Security Agreement, Brookridge also advanced $5,000 and authorized Felix to request subsequent advances in accordance with the grid set out in Schedule A to the agreement.

39.   Brookridge's claims are secured by:

(a)   the Brookridge Loan and Security Agreement, which secures all past and future indebtedness of Felix to Brookridge; and

(b)   a General Security Agreement between Brookridge, as the secured party, and Felix, as grantor, dated February 10, 2024, attached hereto as **Exhibit "DD"**.

40.   Mr. Boxer, Brookridge, and the Mordy Trust negotiated a forbearance with Felix, which was confirmed in correspondence from those parties to Felix dated February 9, 2024. Attached hereto as **Exhibit "EE"** is a true copy of the correspondence.

ii.   Second Lien Lenders

41.   As of November 15, 2024, the books and records indicate that Mr. Steve Hall, SR Hall, and DapIt are collectively owed approximately US$920,000 (CA$1,253,346.41) (this likely does not account for all interest and fees) pursuant to the following documents:

(a)   Demand Loan Agreement and associated Secured Promissory Note dated February 14, 2024 for US$140,000 attached hereto as **Exhibit "FF"**;

(b)   Demand Loan Agreement and associated Secured Promissory Note dated February 27, 2024 for US$80,000 attached hereto as **Exhibit "GG"**;

- 14 -

(c)      Demand Loan Agreement and associated Secured Promissory Note dated March 13, 2024 for US$70,000 attached hereto as **Exhibit "HH"**;

(d)      Demand Loan Agreement and associated Secured Promissory Note dated April 8, 2024 for US$55,000 attached hereto as **Exhibit "II"**;

(e)      Demand Loan Agreement and associated Secured Promissory Note dated April 10, 2024 for US$135,000 attached hereto as **Exhibit "JJ"**;

(f)      Demand Loan Agreement and associated Secured Promissory Note dated April 26, 2024 for US$185,000 attached hereto as **Exhibit "KK"**;

(g)      Demand Loan Agreement and associated Secured Promissory Note dated May 13, 2024 for US$145,000 attached hereto as **Exhibit "LL"**; and

(h)      Demand Loan Agreement and associated Secured Promissory Note dated August 14, 2024 for US$110,000 attached hereto as **Exhibit "MM"**.

42.      While the above documents indicate that they are secured by a security agreement, based on my review of the books and records of Felix, I have only been able to locate a security agreement attached as Schedule A to each of the Demand Loan Agreements, listed in paragraph 41 above, which grants the applicable lender a security interest in the T661 Scientific Research and Experimental Development expenditures claims claimed by Felix from 2023 onward. I have not seen any further documentation evidencing a further security interest being granted to Mr. Hall, SR Hall and Daplt, notwithstanding the registration of a broader interest in August 2024 listed in the PPR Search.

43.      I understand that the amount of the Second Lien Lender's claim (including other amounts that are claimed to be secured), and the extent and priority of such security is likely to be contested and will require a claims process to resolve.

iii.    <u>RBC</u>

44.      Felix holds a guaranteed investment certificate ("**GIC**") for $20,000 with RBC, which has been pledged to secure the obligations of Felix to RBC under its credit card. RBC has registered its interest in the GIC. Felix does not seek to prime the interest of RBC in the GIC, and otherwise seeks to have RBC unaffected in these proceedings. The RBC credit card is used by Felix to conduct its day-to-day business, and are necessary for ongoing operations.

   **d.**    <u>**Unsecured Obligations**</u>

45.    As of November 15, 2024, Felix has approximately 52 unsecured creditors, with claims totalling approximately $17.1 million.

46.    Felix's unsecured creditors can largely be summarized into three groups by jurisdiction:

   (a)    Unsecured creditors based in Georgia consist of Mr. Steve Hall, BBSG, and Ripcord;

   (b)    Unsecured creditors based in New York consist of DapIt and Maxifi; and

   (c)    Unsecured creditors based in Ohio consist of the Robert Alpert Group (as defined below).

47.    As of November 15, 2024, the books and records of Felix indicate that Mr. Steve Hall is owed approximately $3.5 million. Mr. Hall is an owner or investor in four other creditors of Felix: Maxifi Holdings LLC ("**Maxifi**"), BBSG, Ripcord, and DapIt (collectively, the "**Steve Hall Group**"). The relationship between Felix and Mr. Hall was exclusively handled by Mr. Newport, and there are several conflicting documents relating to the Steve Hall Group's investments. As of November 15, 2024, the underlying entities of the Steve Hall Group are owed the following amounts:

   (a)    BBSG is owed approximately $2.8 million, as evidenced by:

      (i)    a Loan Agreement and Promissory Note dated October 7, 2021 owing to BBSG Hall Investments LLC in the principal amount of US$2,000,000 attached hereto as **Exhibit "NN"**;

      (ii)    a Simple Agreement for Future Equity dated November 1, 2021 owing to BBSG Hall Investments LLC in the principal amount of US$1,000,000 attached hereto as **Exhibit "OO"**; and

      (iii)    a Promissory Note dated May 13, 2022 owing to BBSG Hall Investments LLC in the principal amount of US$1,220,000 attached hereto as **Exhibit "PP"**.

   (b)    Ripcord is owed approximately $254,000, as evidenced by:

- 16 -

(i)   a Simple Agreement for Future Equity dated November 1, 2021 owing to Ripcord Capital LLC in the principal amount of US$1,000,000 attached hereto as **Exhibit "QQ".**

(c)   Maxifi is owed approximately $310,000, as evidenced by:

(i)   a Convertible Promissory Note dated September 9, 2021 owing to Maxifi Holdings LLC in the principal amount of US$180,000 due March 9, 2022 attached hereto as **Exhibit "RR".**

(d)   DapIt is owed approximately $2 million.

The exact amount and nature of these claims may need to be addressed in a claims process.

48.    Based on my review of the books and records of Felix, as of November 15, 2024, Mr. Robert Alpert and his related entities (the "**Robert Alpert Group**") have contingent claims against Felix for approximately $2.9 million and Mr. Alpert is owed approximately US$1.2 million pursuant to the Convertible Note Purchase Agreement dated February 21, 2021, and as amended, attached hereto as **Exhibit "SS"**.

49.    The records indicate that the Robert Alpert Group provided Felix with capital predominantly between September 2020 and February 2021. This was originally recognized as revenue under a commercial agreement between Felix and Mr. Alpert's company, Onosys. On December 27, 2023, I was advised by Gregory Brown of Dentons LLP that the Robert Alpert Group filed a lawsuit against Felix for breaching his group's Convertible Promissory Notes. Pursuant to the claim, I learned the details of the alleged original agreement made between Mr. Newport and Mr. Alpert. The claims are set out in:

(a)   the Complaint for Breach of Contract dated November 27, 2023 filed with the Court of Common Pleas of Cuyahoga County, Ohio attached hereto as **Exhibit "TT"**; and

(b)   the Notice of Civil Claim dated August 26, 2024 filed with the Supreme Court of British Columbia, Action No. S-245876 attached hereto as **Exhibit "UU"**.

50.    As of November 15, 2024, Mr. Owen Newport claims to be owed approximately $1.6 million. Mr. Newport is ex-co-founder, co-CEO, and Director at Felix. Mr. Newport advanced funds to support working capital requirements. Felix and Mr. Newport did not formalize these

- 17 -

advances with any documentation, and their nature (debt vs. equity) and any potential defences of Felix need to be addressed in a claims process, should they become relevant.

51.    As of November 15, 2024, Mr. Kieran Moloney is owed approximately $45,000. Mr. Moloney is a founder and Database & Portal Manager at Felix. Mr. Moloney advanced the funds to support working capital requirements in December 2023 and January 2024. Felix and Mr. Moloney did not formalize these advances with any documentation.

52.    Based on my review of the books and records of Felix, as of November 15, 2024, Mr. Don Paris, of Flat World Payment Foundry, is owed approximately $386,000. Mr. Paris provided capital to Felix between September 2020 and June 2023. To the best of my knowledge, Felix and Mr. Paris did not formalize these advances with any documentation and their nature (debt vs. equity) and any potential defences of Felix need to be addressed, if relevant.

53.    Based on my review of the books and records of Felix, as of November 15, 2024, New Direction IRA Inc. is owed approximately $70,000. New Direction IRA Inc. is a self-directed individual retirement account custodian. Felix does not know who authorized the transfer of funds and I have not been able to locate any documentation relating to the amount or lender, and their nature (debt vs. equity) and any potential defences of Felix need to be addressed, if relevant.

54.    Based on my review of the books and records of Felix, as of November 15, 2024, Mr. David Martin is owed approximately $20,000. Mr. Martin is a Vancouver-based businessman introduced to the company around January 2023. Mr. Martin advanced funds to support working capital requirements. I have not been able to locate documents where Felix and Mr. Martin formalized these advances with any documentation and their nature (debt vs. equity) and any potential defences of Felix need to be addressed, if relevant.

55.    It is my understanding that Felix may have outstanding amounts owing to the Business Development Bank of Canada. On November 20, 2024, the Proposal Trustee provided Felix a copy of a demand letter it had received from the Business Development Bank of Canada claiming the amount of $320,667.98. A true copy of that letter is attached hereto as **Exhibit "VV"**. I am investigating the claim and will provide this Court more information at the Comeback Hearing.

    e.    **Employee Liabilities**

56.    Felix is current with respect to the payment of payroll. However, the remittance of employee source deductions is behind in respect of three payrolls in the period of February 1 to

March 15, 2024 in the aggregate amount of approximately $210,857.18, including fees and interest. The company also has recorded liabilities of $1,111.09 (Work Safe BC) and $42,000.00 (Ministry of Finance BC, Employer Health Tax).

57.    I understand there may be additional claims related to employment and management matters by:

> (a)    Warren Hogg for approximately $18,750 stemming from the end of his employment and a complaint made to the British Columbia Employment Standards Branch;

> (b)    Vincenzo DePalma for approximately $540,000 and equity shares relating to an alleged management agreement; and

> (c)    Gary Evans for approximately $51,000 relating to an alleged wrongful termination.

Each of these claims is disputed.

### f.    Taxes

58.    Felix has always been a pre-profit business and, therefore, has never been required to remit income taxes. As of November 15, 2024, the accounting net operating loss carry-forward of Felix is approximately $18.7 million.

### g.    Rent

59.    Felix is up to date on all rent payments except some amounts outstanding dating back to February 2024 in the amount of $59,655.48. This amount is owed to the landlord of Felix's previous head office at 1286 Homer St., Vancouver.

### h.    Critical Suppliers

60.    Given the nature of its business, Felix relies on a number of vendors and third-party service providers and, as such, is a party to a number of agreements for the provision of certain essential services including, among other things, software security, certification labs, third-party platforms, and other services provided in connection with operating a business in the technology industry. Felix has accrued a significant amount owing to third-party suppliers, totalling approximately $1,195,049. Any interruption of service from these parties, either because they are

unable to continue to provide their services to Felix or refuse to do so on account of unpaid pre-filing amounts owed to them by Felix, may prevent Felix from operating in the ordinary course and continuing to provide uninterrupted services to its customers.

61.     Felix owes an aggregate of approximately $571,628.50 to six critical suppliers (the "**Critical Suppliers**"):

(a)     RBC is owed approximately $20,489.31, relating to the continued use of the credit card. As noted above, this amount is secured by the GIC, but it is necessary to pay the existing balance to ensure continued access to the credit cards.

(b)     FIME Inc. is owed approximately $85,883.99. FIME Inc. is a third-party lab working with Felix to maintain various required certifications. Specifically, FIME handles EMV Level 2 certifications with card brands (including VISA, Mastercard, American Express, and Discover).

(c)     Azure (Microsoft) is owed approximately $11,225.71. Felix has engaged with Microsoft to use its Azure cloud platform for its production environment. Azure offers key features that will help Felix attain its Mobile Payments on COTS Solutions ("**MPoC**") certification and better support large-scale deployments that Felix hopes to achieve in 2025.

(d)     Riscure B.V. is owed approximately $212,632.43. Riscure B.V. is a third-party security lab specializing in professional testing solutions and software to analyze, diagnose, and improve the security of embedded systems. The security services provided by Riscure meet the requirements under PCI SSC's MPoC security standard, which few security labs are accredited to provide. Felix has completed approximately 80% of the requirements for certification of its Android SDK solution. The remaining 20% will be conducted during Q4 2024 and Q1 2025. Very few companies have been able to achieve this certification and, to optimize the value of its assets through the CCAA Proceeding, it is crucial that Felix completes its work with Riscure and achieves its certification.

(e)     QT Company is owed approximately $9,977.89. QT Company provides a third-party product that helps deploy Felix's solution across different operating systems and therefore is critical to maintaining key commercial opportunities in Android, Windows, and Linux environments.

(f)   Zimperium is owed approximately $177,419.17. Zimperium provides software security products for mobile platforms that help protect data and systems from external threats. Two of Zimperium's products are now core components of Felix's product and are included as part of Felix's security reviews.

62.   Without the continued provision of services by the Critical Suppliers, Felix's assets, business and value would be at material risk. It is necessary to ensure these parties continue to advance Felix's technology to ensure continued value.

## V.   LIQUIDITY ISSUES AND NEED FOR CREDITOR PROTECTION

63.   Companies operating payment processing technology are highly regulated. Therefore, Felix requires a number of certifications to operate its product. Felix is in the start-up phase and is still in the process of achieving these certifications, as discussed above. Those certifications are time and resource intensive and have been the largest financial burden on Felix since its incorporation. Certifications require companies to, among other things:

(a)   contract with an accredited laboratory to test their product;

(b)   develop software that is compliant with the applicable standards, including strenuous security standards, that integrate payment software and protection components; and

(c)   submit the product to the laboratory for evaluation, which will evaluate the technology's policies and procedures, inspect the technology for compliance, and assess the product's security features.

64.   Certifications are particularly important to win large contracts with key customers, including financial institutions and sophisticated large-scale retailers. Therefore, Felix has invested significant capital in obtaining a number of these certifications. These certifications are key to the growth and commercialization of Felix's business.

65.   Given the significant costs, but remaining obstacles to profitability, Felix is experiencing a liquidity crisis because funding has stopped except through DIP financing. The records of Felix are incomplete, and there is a dispute among the investors and Felix regarding the amount, nature and security of those debts. The liquidity crisis has reached a critical juncture in the last fiscal year, despite a number of actions taken by management in an effort to reduce Felix's

ongoing obligations and to obtain sufficient liquidity to support its short-term needs. Felix has incurred recurring losses and negative cash flows from operations. The liquidity crisis has been exacerbated by concerns around actions by certain of Felix's creditors and related parties (discussed below).

66.     Felix's liquidity concerns crystalized on September 16, 2024, when Felix received a demand letter and accompanying notice of intention to enforce security pursuant to s. 244 of the BIA from the Second Lien Lenders. The letter demanded immediate repayment of the US$11,619,903 (CA$15,790,829) claimed to be owing as of August 31, 2024, pursuant to the Second Lien Lenders' secured loans. This demand initiated Felix's commencement of the NOI Proceeding. As noted, the amount of the debt and the security of the Second Lien Lenders is contested and will likely require a claims process to resolve. A copy of the demand letter dated September 16, 2024 is attached hereto as **Exhibit "WW"**.

67.     Felix filed the NOI to provide it with breathing room and expanded protections necessary to organize its financial affairs and develop a plan for the continuation of the business as a going concern. Since the NOI Filing Date, Felix has acted in good faith and made diligent efforts to improve its liquidity position, stabilize its operations, and pursue a going-concern solution for the company. These efforts have included, among others, the negotiation of additional financing, entering discussions with critical suppliers to avoid disruption to their services, and engaging with its key stakeholders.

68.     In the lead up to the commencement of the CCAA Proceeding, Felix has engaged with a number of its key stakeholders, including the DIP Lender and some trade creditors, regarding Felix's proposed restructuring plan. I understand that the DIP Lender is supportive of Felix's restructuring plan. In the event that the Initial Order is granted, Felix intends to continue its engagement with stakeholders in advance of the hearing seeking an Amended and Restated Initial Order, with the goal of further refining its restructuring plan in a manner that addresses, to the extent possible in the circumstances, any concerns regarding the proposed path forward.

## VI.     RESTRUCTURING PLAN WITHIN THE CCAA

69.     Since commencing the NOI Proceeding, Felix has worked with the Proposal Trustee to develop a restructuring plan to address the company's liquidity concerns. Felix and the Proposal Trustee agree that the best path forward to effectuate the restructuring is to continue the NOI Proceeding as a proceeding under the CCAA.

70.    The protections afforded under the CCAA would facilitate Felix's ability to conduct the SISP, and to commence a claim process in a bespoke manner to allow the valuation of claims as relevant. Given the various claims asserted by the creditors noted above, and the questions regarding the validity, priority, and nature of certain of those claims, a claims process will be required. However, not all creditors' interests need to be confirmed until the value of the business is known.

71.    Felix is also investigating prospective claims against some of its creditors and other people associated with those creditors and intends to pursue those claims within the proposed CCAA Proceeding, where they can be litigated in an expeditious manner in order to maximize value and minimize the time involved.

72.    The prospective claims being investigated are anticipated to be material to the value of the going concern value of Felix. Moreover, the prospective claims involve documentation allegedly signed on behalf of the company and, as a result, the company needs additional time to review all documents before returning to this Court with a more comprehensive review of Felix's prospective claims.

73.    As noted, Felix's business value is as a going-concern. Its people are key to it retaining its value. Accordingly, Felix anticipates seeking approval of a key employee retention plan should CCAA protection be granted.

## VII.    THE PROPOSED INTERIM FINANCING

74.    On November 21, 2024, Felix entered into a binding commitment letter in respect of the DIP Facility (the "**DIP Agreement**") with Felix as borrower (in such capacity, the "**Borrower**") and the DIP Lender as lenders. A copy of the DIP Agreement is attached hereto as **Exhibit "XX"**.

75.    The DIP Agreement provides for a super-priority, non-revolving credit facility of up to $2.1 million.

76.    The amounts drawn and outstanding under the DIP Facility will bear interest at 18%, with interest on the principal amount outstanding accruing on the first business day of each month.

77.    The DIP Facility includes a commitment fee of $30,000, which shall be earned and payable in two phases:

    (a)    $7,000 is earned upon the execution of the DIP Agreement; and

(b)     $23,000 is earned upon the granting of the Amended and Restated Initial Order.

78.    The DIP Facility is conditional, among other things, upon the granting of a priority charge over the property in favour of the DIP Lender to secure the amounts borrowed under the DIP Facility (the "**DIP Lender's Charge**").

79.    In accordance with the DIP Agreement, the DIP Facility is to be used during the CCAA Proceeding to fund:

(a)     operating expenses in accordance with the Cash Flow Forecast (as defined below);

(b)     fees and expenses associated with the DIP Facility (including without limitation certain expenses, fees of the Monitor (as defined below), and legal fees of counsel to the DIP Lender, Felix and the Monitor); and

(c)     such other costs and expenses as agreed to by the DIP Lender, in writing.

80.    The DIP Facility is subject to customary covenants, conditions precedent, and representations and warranties made by Felix to the DIP Lender. The DIP Facility must be repaid in full by the date that is the earlier of:

(a)     February 28, 2025, or such other date as may be agreed to by the DIP Lender and the Borrower;

(b)     the effective date of any Plan (as defined in the DIP Agreement);

(c)     the early termination of the DIP Facility in accordance with the terms of the DIP Agreement upon the occurrence and continuation of an Event of Default (as defined in the DIP Agreement);

(d)     the closing of the purchase and sale of all or substantially all of the assets or shares of the Borrower; and

(e)     the termination, expiration, or conversion of the CCAA Proceeding.

81.    The amount of the DIP Facility to be funded during the initial Stay of Proceedings (up to a principal amount of $400,000) is only that portion that is necessary to ensure the continued operation of Felix's business in the ordinary course during the initial ten (10) days.

## VIII.    RELIEF SOUGHT AT THE INITIAL HEARING

### a.    Stay of Proceedings

82.    Felix requires the continuation of a broad stay of proceedings to prevent enforcement action by certain contractual counterparties and to provide Felix with breathing space while it attempts to effect a restructuring, all the while permitting its business to continue to operate as a going concern. Therefore, Felix is seeking an initial stay of proceedings until December 5, 2024 (the "**Stay of Proceedings**").

83.    Felix is concerned about its failure to meet certain obligations as they become due. As noted above, Felix is already behind on payments to certain third-party suppliers and other counterparties.

84.    Felix understands that the proposed DIP Lender is not prepared to extend further credit outside the protection of the CCAA. It is in the interest of all stakeholders for Felix to undertake a coordinated restructuring under the CCAA to protect and maximize value for stakeholders and avoid a bankruptcy. Absent the Stay of Proceedings (and associated financing), Felix will not be able to continue to operate its business and will be forced to initiate an abrupt disorderly shutdown and bankruptcy.

85.    In light of the foregoing, the Stay of Proceedings is in the best interests of Felix and its stakeholders. I understand that the proposed Monitor (and current Proposal Trustee) believes that the Stay of Proceedings is appropriate in the circumstances.

### b.    Monitor

86.    The proposed Initial Order contemplates that A&M will act as the Monitor (in such capacity, the "**Monitor**") in the CCAA Proceeding. A&M is the existing Proposal Trustee, and I understand that A&M has consented to act as the Monitor of Felix in the CCAA Proceeding if the proposed Initial Order is granted. A copy of A&M's consent to act as the Monitor is attached hereto as **Exhibit "YY"**. A&M (and its principals) are not directors, officers, or employees of Felix, are not, to my knowledge, related to Felix or any director or officer of Felix, and have never been the auditors, accountants, or legal counsel to Felix.

- 25 -

### c.   Ability to Pay Certain Pre-Filing Amounts

87.   Pursuant to the proposed Initial Order, Felix is seeking authorization (but not the obligation) to pay, among other things:

  (a)   all outstanding and future wages, salaries, employee benefits, vacation pay, and employee expenses payable on or after the date of the Initial Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

  (b)   with the consent of the Monitor and the DIP Lender, amounts owing for goods and services actually supplied to Felix prior to the date of the Initial Order, with the Monitor considering, among other factors, whether (i) the supplier or service provider is essential to the business and ongoing operations of Felix and the payment is required to ensure ongoing supply, (ii) making such payment will preserve, protect, or enhance the value of the business, (iii) making such payment is required to address regulatory concerns, and (iv) the supplier or service provider is required to continue to provide goods or services to Felix after the date of the Initial Order, including pursuant to the terms of the Initial Order; and

  (c)   the fees and disbursements of any professionals retained or employed by Felix in respect of the CCAA Proceeding, at their standard rates and charges.

88.   I believe this relief is necessary to maintain ordinary course operations, particularly given the highly regulated nature of Felix's business. Felix's ability to operate its business in the normal course is dependent on its ability to obtain an uninterrupted supply of certain goods and services.

89.   I understand that the Monitor and the DIP Lender are supportive of this relief.

### d.   Administrative Charge

90.   The Initial Order provides for a court-ordered charge in favour of the Monitor, as well as counsel to the Monitor and Felix, over Felix's property, to secure payment of their respective fees and disbursements incurred in connection with services rendered in respect of Felix up to a maximum amount of $150,000 (the "**Administration Charge**"). The Administration Charge is proposed to rank ahead of and have priority over all of the other Charges.

91.    Felix requires the expertise, knowledge, and continued participation of the proposed beneficiaries of the Administration Charge during the CCAA Proceeding in order to complete a successful restructuring. Each of the beneficiaries of the Administration Charge will have distinct roles in Felix's restructuring.

92.    Felix and the Monitor worked collaboratively to estimate the quantum of the Administration Charge required, which takes into account the limited retainers the professionals currently have and their material outstanding fees. I believe that the Administration Charge is fair and reasonable in the circumstances. I understand that the Monitor is also of the view that the Administration Charge is fair and reasonable in the circumstances, and that the proposed DIP Lender supports the Administration Charge.

93.    Felix intends to seek an increase to the Administration Charge to $250,000 at the hearing prior to the expiry of the Stay of Proceedings (the "**Comeback Hearing**").

  e.    **Directors' Charge**

94.    It is my understanding that Felix's present and former directors and officers (the "**Directors and Officers**") are not currently insured under any liability insurance policies as all applicable policies expired in October 2024.

95.    Given the risks related to the CCAA Proceeding and the uncertainty surrounding available indemnities and insurance, I am informed by Peter Smyrniotis and Aneil Manhas (the directors of Felix)**,** as well as my own personal knowledge, that the current Directors and Officers' involvement in the CCAA Proceeding is conditional upon the granting of a priority charge in favour of the Directors and Officers in the amount of $150,000 (the "**Directors' Charge**") to cover any obligations incurred by the Directors' and Officers' in their capacity as directors and officers in these proceedings, to the extent the same are not covered by insurance.

96.    Felix requires the involvement of the Directors and Officers in order to continue business operations in the ordinary course. The proposed Initial Order contemplates that the Directors' Charge will rank subordinate to Administration Charge and the DIP Lender's Charge.

97.    Felix believes that the Directors' Charge is reasonable in the circumstances. I understand that the Monitor and the DIP Lender are supportive of the Directors' Charge and its quantum.

98.     Felix intends to seek an increase to the Directors' Charge at the Comeback Hearing to be commensurate with the exposure of the Directors and Officers to potential liabilities during an extended stay period.

### f.     DIP Lender's Charge

99.     The DIP Agreement provides, among other things, that the DIP Facility is contingent on the granting of the DIP Lender's Charge subordinate to the Administration Charge, but in priority to all other claims (except for RBC in relation to the GIC).

100.    Pursuant to the proposed Initial Order, the DIP Lender's Charge will secure all of the funds advanced under the DIP Facility. The DIP Lender's Charge will not secure obligations incurred prior to the CCAA Proceeding.

101.    The amount to be funded under the DIP Facility during the initial Stay of Proceedings is limited to the amount necessary to ensure the continued operations of Felix's business. Correspondingly, the DIP Lender's Charge under the proposed Initial Order is limited to the amount to be funded during the initial Stay of Proceedings. Felix intends to seek an increase to the DIP Lender's Charge at the Comeback Hearing to the full principal amount available under the DIP Facility.

## IX.    CASH FLOW FORECAST

102.    With the assistance of the Monitor, Felix has undertaken a cash flow analysis to determine the quantum of funding required to finance their operations, assuming the Initial Order is granted, over the 15-week period through to the week ending March 2, 2025 (the "**Cash Flow Forecast**"). The Cash Flow Forecast is attached hereto as **Exhibit "ZZ"**.

103.    The Cash Flow Forecast indicates that Felix urgently requires DIP financing to ensure that it has the liquidity required to meet its obligations and continue its business operations during the Stay of Proceedings. However, with the DIP Facility in place, Felix will have sufficient liquidity to meet its obligations during the Stay Period.

## X.     CONCLUSION

104.    I believe that the proposed Initial Order is in the best interests of Felix and its stakeholders. The Stay of Proceedings and the DIP Facility will allow Felix to continue ordinary course operations with the breathing space and stability necessary to develop and implement its

- 28 -

restructuring. Absent the Stay of Proceedings and approval of the DIP Facility, Felix will be unable to meet its obligations as they become due, which would be detrimental to the value of its business, and in turn, the interests of its stakeholders. I believe Felix has, and continues to, work in good faith and with due diligence.

105.    In the circumstances, I believe that the CCAA Proceeding is the only viable means of restructuring Felix's business for the benefit of its stakeholders and that the relief sought in the Initial Order is limited to what is reasonably necessary to stabilize the business in the initial ten day period.

SWORN BEFORE ME at Vancouver,　　　　)
British Columbia, this 21st day of　　　　　)
November, 2024.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
_____　　)　　_____
A Commissioner for taking Affidavits for　)　　　　　　**ANDREW COLE**
British Columbia

**ASHLEY BOWRON**
Barrister & Solicitor
McCarthy Tétrault LLP
SUITE 2400 - 745 THURLOW STREET
VANCOUVER, B.C.   V6E 0C5
604-643-7973

This is **Exhibit "A"** referred to in **Affidavit #1** of **Andrew Cole**, sworn before me at Vancouver, British Columbia, this 21st day of November, 2024.

_____
A Commissioner for taking Affidavits
for British Columbia

EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| FELIX PAYMENT SYSTEMS LTD. | ) | Case No. 25-_____ (__) |
| | ) | |
| Debtor. | ) | Chapter 15 |
| | ) | |

**ORDER GRANTING EMERGENCY MOTION FOR PROVISIONAL RELIEF UNDER**
**SECTION 1519 OF THE BANKRUPTCY CODE**

THIS MATTER came before the Court upon the *Emergency Motion for Entry of an Order Granting Provisional Relief Under Section 1519 of the Bankruptcy Code* (the "Motion"). Through the Motion, Felix Payment Systems Ltd. as the foreign debtor and foreign representative (the "Foreign Debtor" or "Foreign Representative") seeks the entry of an Order (as described in the Motion) granting provisional relief pursuant to Sections 105(a) and 1519(a). of the Bankruptcy Code. Upon consideration of any responses or oppositions to the Motion, and after due and sufficient notice of and hearing on the Motion, makes the following:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

A. This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

B. Venue is proper in his district pursuant to 28 U.S.C. § 1410.

C. This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D. Good, sufficient, appropriate and timely notice of the filing of the Motion and the hearing on the Motion has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1012(b), and 9006(c) and the Court's order shortening time on the Motion, to: (a) the Office of the United States Trustee for the Eastern District of North Carolina; (b) the Monitor, (c) any known creditor of the Foreign Debtor for whom the Foreign Debtor has an address, (d) the Robert Alpert Group (as defined in the Motion); and (e) any party-in-interest that becomes known to the Foreign Representative by U.S. Mail within two (2) business days following the time any such party is identified by the Foreign Representative.

E. There is an urgent need for the relief set forth herein to protect the assets of the Foreign Debtor and/or the interests of creditors.

F. The Foreign Debtor as Foreign Representative has complied with the standards, procedures, and limitations applicable to an injunction with respect to the relief requested herein as required by Section 1519(e) of the Bankruptcy Code.

G. There is a reasonable and substantial likelihood that the Foreign Debtor as Foreign Representative will obtain recognition of the CCAA Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

H.     The enforcement of the Initial Order and the Amended and Restated Initial Order to prevent the commencement or continuation of any action or proceeding in the United States against the Foreign Debtor or any of the Foreign Debtor's assets or proceeds thereof will permit the expeditious and economical administration of the Foreign Debtor's estate in the CCAA Proceeding, and the relief requested either: (a) will not cause any undue hardship to the Robert Alpert Group or other parties in interest or (b) any hardship to the Robert Alpert Group or other parties in interest is outweighed by the benefits of the relief requested.

I.     Unless the provisional relief is issued, there is a material risk that the Foreign Debtor's assets could be subject to efforts by the Robert Alpert Group or other creditors or other parties in interest in the United States to control or possess the Foreign Debtor's assets located in the United States or take other detrimental business acts against such assets of the Foreign Debtor.

J.     Such acts could: (a) interfere with and cause harm to the jurisdictional mandate of this Court under Chapter 15 of the Bankruptcy Code; (b) interfere with and cause harm to the Foreign Debtor's efforts to administer their estates pursuant to the CCAA Proceeding; and (c) undermine the Foreign Debtor's efforts to achieve an equitable result for the benefit of all of the Foreign Debtor's creditors.

K.     There is a material risk that the Foreign Debtor may suffer immediate and irreparable injury for which they will have no adequate remedy at law, and therefore, it is necessary that the Court enter this Order.

L.     The interest of the public will be served by this Court's entry of this Order by, *inter alia*, facilitating the Foreign Debtor's efforts to restructure its business under the Bankruptcy Code and applicable Canadian law.

3

M.    The Foreign Debtor is entitled to the full protections and rights available pursuant to Section 1519(a) of the Bankruptcy Code.

**WHEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED** that:

1.    The Motion is **GRANTED** in its entirety;

2.    Upon entry of this Order, and continuing until the date of the entry of an order of this Court recognizing the CCAA Proceeding as a "foreign main proceeding" as defined in Section 1502(4) and the Foreign Debtor as Foreign Representative as a "foreign representative" as defined in Section 101(24) of the Bankruptcy Code, unless otherwise extended pursuant to Section 1519(b) and 1521(a)(6) of the Bankruptcy Code, it is ordered that:

   a.    The Initial Order and the Amended and Restated Initial Order are fully enforceable against any effort by the Robert Alpert Group or any other party against the Foreign Debtor or its assets located in the United States;

   b.    the protections of Section 362 of the Bankruptcy Code apply to the Foreign Debtor and their assets in the United States;

   c.    the Foreign Debtor as Foreign Representative is established as the representatives of the Foreign Debtor with full authority to administer the Foreign Debtor's assets and affairs in the United States;

   d.    all persons and entities are enjoined from seizing, attaching and/or enforcing or executing liens or judgments against the Foreign Debtor's property in the United States or from transferring, encumbering or otherwise disposing of or interfering with the Foreign Debtor's assets or agreements in the United States without the express consent of the Foreign Representative; and

   e.    all persons and entities are enjoined from commencing or continuing, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against the Foreign Debtor or its assets or proceeds thereof, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative or other judgment, assessment, order, lien or arbitration award against the Foreign Debtor or its assets or proceeds thereof.

3.    Until further order of this Court, the Foreign Debtor as Foreign Representative is hereby established as the exclusive representatives of the Foreign Debtor in the United States;

4.      Any violation of the stay imposed by this Order and section 1520 and such other provisions of the Bankruptcy Code, shall subject such party to sanctions;

5.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Foreign Representative is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Foreign Representatives is authorized and empowered, and may in its discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order;

6.      This Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the Motion, the Petition, or the interpretation or implementation of this Order.

[END OF DOCUMENT]